[No. 14813. Department One. January 24, 1919.]

## MAGGIE WALL, *Respondent*, v. ESTATE OF MARY McENNERY *et al., Appellants.*[1]

ADOPTION—BY CONTRACT—VALIDITY. There being no right of adoption at common law, an agreement for an adoption prior to the passage of the first territorial act authorizing adoptions in this state, is not valid to give the status of an heir under the laws of inheritance.

SPECIFIC PERFORMANCE (11) — CONTRACTS ENFORCIBLE — INVALID CONTRACT FOR ADOPTION. A contract for adoption will not be specifically enforced, so as to give a right of inheritance, because of a good faith attempt to make the adoption by contract, where there was at the time no authority in law for an adoption.

SAME (25, 51)—WILLS (8-1)—CONTRACT TO DEVISE—EVIDENCE—SUFFICIENCY. A contract by foster parents to "leave" property in consideration of services performed by one who was never legally adopted, will not be specifically enforced unless clearly proved, and it is not sufficient to show services as a child, that she was sent to school, and that the foster parents had stated that they had adopted her, and that she was their heir and would inherit their property without the making of any will.

Appeal from a judgment of the superior court for Garfield county, Miller, J., entered September 17, 1917, upon findings in favor of the plaintiff, in an action for specific performance, tried to the court. Reversed.

*Kuykendall & McCabe* and *S. O. Tannahill,* for appellants.

*G. W. Jewett* and *Losey & Newton,* for respondent.

CHADWICK, C. J.—Maggie Wall, the respondent, was born about the year 1866. When about two years old her father died. Her mother put her in a charitable institution. Afterwards, possibly in the year 1871 or 1872, one James Newman and wife were given the custody of the child.

[1]Reported in 178 Pac. 631.

Respondent says that she was adopted and went to live with the Newman family on a large ranch near Sacramento. There is no evidence of an adoption. Adoption by the Newmans is assumed rather by counsel from a lack of evidence, a showing being made that the court records in San Francisco county, California, were destroyed in the fire that followed the earthquake in the year 1905.

Respondent came with the Newmans to Washington Territory in the year 1872. The family settled near Dayton, Washington. In 1872 or 1873, respondent was surrendered to William and Mary McEnnery. She says that she went with the Newmans to a lawyer's office in the then town of Dayton, that the lawyer drew a contract which Mr. and Mrs. Newman signed, on the one hand, and Mr. and Mrs. McEnnery, on the other.

Respondent then went with the McEnnerys and lived with them until about 1880, when she was sent to the Sisters' School at Vancouver, Washington. She was known as Maggie McEnnery, and it seems to have been the understanding of many who knew the McEnnerys in the then sparsely settled country that the girl had been adopted. She was baptized in 1877 by Father Giroda, as ''Maggie, born 13th of April, 1867, from certain McCue in California, but now adopted by William McEnnery. The God-mother was McEnnery.''

That respondent was not adopted under any law providing for adoption is now confessed, for, at the time, the only lawful way to adopt a child was by act of the territorial legislature. A general law giving jurisdiction over adoptions to the district courts was not passed until 1875. Laws 1875, pp. 110-112; Rem. Code, § 1696.

The contract relied on, now claimed to be lost, is the paper drawn up by the lawyer in Dayton, and

which, under the law as it was at that time, must have been as much a contract to relieve Newman of his responsibility for the child as to give its custody to the McEnnerys.

Respondent alleges in her complaint:

"And in accordance with the understanding and agreement, and about the year 1873, said William McEnnery and Mary McEnnery, at the town of.Dayton, in the state of Washington, in the presence of one Mike Buckley, and one William Green, and a certain lawyer, whose name is at this time unknown to plaintiff, did enter into a written agreement with said James Newman, for the use and benefit of the plaintiff herein, wherein and whereby as plaintiff is informed and believes, and therefore alleges the fact to be, said William McEnnery and Mary McEnnery agreed to adopt and did adopt plaintiff, and agreed that plaintiff should at all times thereafter possess, enjoy, and have all the rights and privileges of a child of said William and Mary McEnnery, and that upon the death of said McEnnerys, all their property, if they had no children, and if they did have other children, then a child's portion of their property, should be left to the plaintiff."

As it comes to us, the case presents itself as two distinct questions: (a) Whether a contract for adoption is valid to give respondent the status of an heir under the laws of inheritance; and (b) if it is not, whether a contract of the alleged foster parents to leave their property to respondent has been proved with sufficient certainty to call for a decree of specific performance.

We are unwilling to give our sanction to the first proposition. At the time the contract was entered into, we had no statute authorizing the adoption of infants.

"The right of adoption, while known to the ancients of Greece and Rome, and probably to other ancient peoples, and while practiced among many of the con-

tinental nations under the civil law from the remotest antiquity, is not recognized by the common law of England, and exists in the United States only by virtue of the statutes which have been enacted in many if not all of the states." 1 R. C. L. 593.

The right of adoption was repugnant to the principles of the common law. *Furgeson v. Jones,* 17 Ore. 204, 20 Pac. 842, 11 Am. St. 808, 3 L. R. A. 620.

There being no right of adoption at common law, it follows that there can be no adoption by parol. *In re Carroll's Estate,* 219 Pa. St. 440, 68 Atl. 1038, 123 Am. St. 673.

In *In re Renton's Estate,* 10 Wash. 533, 39 Pac. 145, the exclusiveness of the statutory method of adoption is recognized. There the contestants of the will of William Renton, being children of his wife by a former husband, sought to establish an adoption upon facts showing every element of a family relation. The court said:

"But the answer to these positions is, in the first place, that adoption has never been sustained by mere presumptions, and that the doctrine of title by adverse possession is one adopted by the law for the sake of quieting disputes and not for the purpose of furnishing a ground for raising them. Without a statute, or without compliance with a statute, there is no such thing in our law as the adoption of an heir. Adoption was not known to the common law, and is a matter purely statutory. Courts have passed upon this question frequently, and have adhered with much strictness to this rule."

But counsel maintain that a good faith attempt having been made to make an adoption by deed, or by contract, the court should enforce the contract as a contract to adopt. They cite many cases.

The foundation of respondent's case is well dressed for its setting by the reporter in *Pemberton v. Pemberton's Heirs,* 76 Neb. 669, 107 N. W. 996:

"A contract in writing for the adoption of a child, although ineffective as a legal, statutory adoption, may upon a proper showing be enforced in equity."

But, in almost all the cases relied on, there might have been a legal statutory adoption. The parties attempted to do that which had the sanction of the law, but failed to pursue the statutory method; or, the contract being otherwise legal, failed for the want of some formality. They had failed either to obtain the sanction of a court having jurisdiction, or had failed to contract in the manner provided by law. The *relation,* whether founded in decree, contract, or the equities arising out of an agreement to adopt, had the sanction of statute. To hold that a contract to adopt would give a right of inheritance, in the absence of a statute permitting such relation, would be to hold that that could be done indirectly which could not be done directly.

If there can be no adoption by contract, it follows that equity cannot enforce an agreement to adopt, for the subject-matter of the contract had no countenance in law at the time the writing was entered into. Equity will take jurisdiction to do justice in all those things whereof the law, by reason of its universality, is deficient, and it will give a remedy for every wrong, but it will not create a legal right, in the absence of legislation or some sustaining principle of the common law. Equity is essentially and thoroughly remedial and it will never extend its hand to defeat the policy of the law.

The policy of the law may be declared by legislative enactment, or if the common law be certain by the want of legislative enactment—the adoption of children being in derogation of common law, and there being no statutory method provided by the legislature

at the time the contract is said to have been entered into—it logically follows that there can be no adoption from which a right of inheritance would flow, unless it is accomplished by or through some method recognized by law, either under a general law or by special act of the law making power. The mere living of a child with those who have assumed a care and custody over its person will not make an adoption, although the child may believe that it has been adopted and such belief may be sustained by family tradition or by neighborhood gossip.

A law providing for the adoption of children was passed in New York in 1873, Laws of 1873, ch. 830, but with a saving clause.

"Nothing herein contained shall prevent proof of the adoption of any child, heretofore made according to any method practiced in this state, from being received in evidence, nor such an adoption from having the effect of an adoption hereunder."

The New York court, being mindful of the repugnancy of the common law to adoptions, held:

"While there has been some diversity of opinion in the lower courts as to the precise meaning of this clause, we think the only construction permissible is that it refers to those forms of adoption theretofore existing by virtue of special statutory enactments contained in the charters of charitable societies that received destitute and homeless children, and whose officers were permitted to execute agreements of adoption on their behalf with suitable persons willing to assume the obligations of parents. . . . It is obvious that the legislature did not have in contemplation the legalizing of private agreements executed without authority of law and containing no safeguards or restrictions of any kind as to the transmission of property. Any such construction of the saving clause in the act of 1873 might seriously affect the titles to real estate and introduce many elements of danger.

"It follows that the agreement in this case, relied on to create the relation of foster parents and adopted child, worked no such result." *In re Thorne's Will,* 155 N. Y. 140, 49 N. E. 661.

No attempt was made to save existing contracts in our statute.

See, also, *Smith v. Allen,* 161 N. Y. 478, 55 N. E. 1056; *Wallace v. Rappleye,* 103 Ill. 229; *Davis v. Jones' Adm'r,* 94 Ky. 320, 22 S. W. 331, 42 Am. St. 360; *Shearer v. Weaver,* 56 Iowa 578, 9 N. W. 907; *Renz v. Drury,* 57 Kan. 84, 45 Pac. 71; *In re Johnson's Estate,* 98 Cal. 531, 33 Pac. 460, 21 L. R. A. 380; *Albring v. Ward,* 137 Mich. 352, 100 N. W. 609; *Bowins v. English,* 138 Mich. 178, 101 N. W. 204.

There are a few cases which seemingly hold to the contrary. In *Burns v. Smith,* 21 Mont. 251, 53 Pac. 742, 69 Am. St. 653, a contract to adopt, there being no statute, was enforced in equity, but the recovery was not based on a right of inheritance growing out of the contract to adopt, but upon a specific promise by the deceased person to leave a definite share of his property in return for services rendered. The invalidity of the contract as one of adoption was admitted. So, in *Wright v. Wright,* 99 Mich. 170, 58 N. W. 54, 23 L. R. A. 196, it was held that a contract would be enforced where the statute, under which it had been drawn, had been held to be unconstitutional. The case was distinguished, if not overruled, in *Albring v. Ward, supra.*

Wherever the doctrine that a child adopted by contract can take as an heir under the laws of inheritance, there being no statute of adoption, has been asserted, we find that it springs from certain New Jersey cases; *Van Dyne v. Vreeland,* 11 N. J. Eq. 370; *Van Tine v. Van Tine* (N. J.), 15 Atl. 249, 1 L. R. A. 155. At the time these cases were decided, there were no statutes

óf adoption in the state of New Jersey. Contracts of adoption were upheld and specifically enforced on the. facts, but, so far as the decisions indicate, the question we have for decision was not raised or discussed. They cannot be accepted in reason, for, as is said in *In re Carroll's Estate, supra:*

"The personal attitude of the inmates of a family towards an adopted child, as regards the family relation, is a matter entirely for the parties. But the matter of inheritance is entirely under the regulation of the law. The right to take property by devise or descent is the creation of the law, and not a natural right."

The true distinction is pointed out in *Chehak v. Battles,* 133 Iowa 107, 110 N. W. 330, 8 L. R. A. (N. S.) 1130, where the case of *Shearer v. Weaver, supra,* is distinguished. Of that case, the court says, at pages 113, 114:

"It is manifest from this language that the court proceeded on the theory that the grantee of the child Isaac was basing his demand for the property on the ground that Isaac had inherited it, and we are in full accord with the proposition that the right of inheritance as such may be conferred upon a stranger in blood only by pursuing the method prescribed by statute. The authorities upholding the right to specific performance never decree that the child is entitled to the right of inheritance as an heir."

There is much of loose expression in the books. Some of the courts have fallen into the error of saying that, although a contract for the adoption of a child be not sustained by a judicial proceeding or by a contract authorized by law, it is nevertheless good as a contract to adopt, and an action for specific performance will lie.

The case of *Pemberton v. Pemberton's Heirs, supra,* is illustrative. The court quotes with evident

approval *Healey v. Simpson*, 113 Mo. 340, 20 S. W. 881, as follows:

"The instrument of writing in question cannot operate as an adoption, as it did not come up to legal requirements, but it can operate as a contract for adoption, which may, upon a proper showing, be specifically enforced in equity."

And similar expressions may be found in other cases; but, as we have noticed, in practically every case where the courts have resorted to such language, the relation had received the sanction of legislative authority. But, over and beyond this consideration, the cases were not turned upon a contract to adopt, for, in the final analysis, specific performance was decreed upon the ground that the child had rendered services under a contract the consideration for which was the bequeathing of the property of the other contracting party. The question of adoption would neither add to, nor take from, the rights of either party. It may be further noted that, in all the cases, the contract was certain as to its terms, the writing was produced, or the testimony left no question of doubt, for, as said in the *Pemberton* case, the form and regularity of the contract as a deed of adoption is wholly immaterial, but the contract to leave the property would be enforced as a contract between the natural mother, legally entitled to the care of the child, and the alleged foster parents. The contract of which equity will take notice goes to property and not to the person or to the personal relations of the parties, except as they throw light upon disputes arising as to its terms.

We find, upon the first premise, therefore, that respondent cannot claim a right of property as an adopted child, for such rights depend upon the law and not upon contract.

If, then, respondent is to recover, it must be in virtue of the contract which she says was entered into in her behalf, the consideration for which was service on her part and for which she was to obtain all the property of the McEnnerys if they died leaving no children.

It is said in one of the cases that the power of a court of equity to grant relief in this class of cases is extraordinary. The rule of evidence applied is the same as where an action is brought to compel the specific performance of a parol contract to convey land. The contract must be established beyond serious doubt.

"In *Walpole v. Oxford,* 3 Ves. 419, the Lord Chancellor laid it down as a general proposition that all agreements, in order to be executed in a court of equity, must be certain and defined, equal and fair, and proved in such manner as the law requires, and that it was enough to doubt in such respect to refuse relief." *Wallace v. Rappleye, supra.*

This must necessarily be so in all cases where the contract would be void under the statute of frauds but for a sufficient part performance. Wherefore, before a contract can be enforced, it must be proved. No serious or, as many of the books say, no reasonable doubt should remain as to the terms of the contract. It must appear that a denial of the remedy would work a fraud upon the complaining party. *Wallace v. Rappleye, Renz v. Drury,* and *Smith v. Allen, supra; Willoughby v. Motley,* 83 Ky. 297; *Keegan v. Geraghty,* 101 Ill. 26; *Baumann v. Kusian,* 164 Cal. 582, 129 Pac. 986, 44 L. R. A. (N. S.) 756.

In cases of this kind, the fact that there was a parol contract of adoption, or a parol contract to adopt, or a lost writing to be proved by parol, will not support a contract to "leave" property that equity will

enforce, for a legal contract of adoption, or to adopt, merely implies that the child will take by inheritance if any property remains for distribution. *Davis v. Hendricks,* 99 Mo. 478, 12 S. W. 887.

It does not imply a specific promise to "leave" any property whatsoever to the adopted child.

"Void articles of adoption are no evidence of themselves of a contract for an interest in property, real or personal." *Albring v. Ward, supra.*

Wherefore—and this disposes of much of the testimony offered on behalf of respondent—family tradition, neighborhood gossip, and all forms of hearsay, including baptismal records, so often relied upon for the want of better evidence, is of little weight to prove a contract to "leave" property at the death of the adopter.

The fact that respondent went to live with the McEnnerys, that they received her services as a child, and sent her to school, are all circumstances that would tend to prove an adoption, if an adoption by contract were possible, but they fall far short of proving a contract to "leave" property, as alleged in the complaint. To recover, respondent must prove a contract of purchase. The mere fact of service in the household of the foster parents would not be proof of a consideration, in the absence of proof, at least reasonably certain, that the McEnnerys, at the time that it is said that the contract was entered into, agreed in terms to "leave" their property to respondent, for, although they had actually adopted respondent, they were under no moral or legal obligation to leave their property to her in the event of death. It is not enough that they may have so obligated themselves; it must be shown as the first truth in the case, and without it the suit cannot go on.

"Some witnesses testified to statements made by Mr. and Mrs. Ward in which they spoke of her as their daughter, and that she called them father and mother. Such statements are consistent with the theory of supposed legal adoption. They are not evidence of a contract to make her an heir, or to convey her any property. If there were any evidence of a legal contract on the part of Mr. Ward to make complainant his heir, such statements might be of some value in proof of the contract." *Albring v. Ward, supra.*

The testimony relied on to show a contract to leave the property to respondent is as follows:

Jane Branton:

"In '78 or '80, I heard Mrs. McEnnery speak of their relationship with Maggie. It was at my sister's, Mrs. Milan's. Mrs. Milan and I were at the corner talking and Mrs. McEnnery came along and got into conversation with us. Mrs. McEnnery said they had Maggie, so no one could take her away from them, had a lawyer at Dayton fix the papers up between them and the Newmans. She said the papers were about the adoption of Maggie; that they had adopted her, were to educate her, give her their property, at their death she was to become their heir and that was what they adopted her for. I had a conversation with Mr. McEnnery six years ago. He asked me if I didn't remember Maggie, and said she would get his property when they died, because they had adopted her. He did not mention any contract or papers."

Mary E. Milan:

"I had a conversation with Mrs. McEnnery about Maggie. I am not positive as to the year. Mrs. Branton was there at the time. She was then thirteen or fourteen years old. Mrs. Branton said, 'You ought to have some one to leave your property to,' and she said she did, that she had adopted Maggie, and took the little child and wanted her to have what belonged to her. She said the papers had been made out for Maggie, showing that Maggie would get their property. I

think this conversation took place in '69. As to the time, I don't remember much about it; it might have been about '70. I was about thirty-one or two. I am now past sixty."

Mrs. Emma Whitmore:

"I knew William and Mary McEnnery during their lifetime. I had a conversation with Mrs. McEnnery about Maggie some seven years ago. She said she had gotten Maggie from Dayton from the Newmans; that she had entered into a writing; that Maggie was her daughter and would have their property at their death."

E. V. Gibson:

"I have heard them talk about Maggie, but Bill never said much about her, the old lady did most of the talking. Mrs. McEnnery said that she didn't have to make any will. 'That is all fixed, our property will go to Maggie, she is our adopted child.' She didn't say whether there was any writing at all. She just said, 'That is already fixed.' I had a conversation some time after that with Mrs. McEnnery. They were getting old, she said, and when they got through with it, it would go to Maggie. Nothing was said about a will."

Mrs. Wilmina Tupper:

"I had a conversation with Mr. McEnnery, Mrs. McEnnery being present, about making a will, the next spring after they moved to town. One of them said that they had a very pretty little girl, and I asked if it was hers and she said no, it was an adopted child, that she was then at school, and he said that he was going down there the next day to see her. He said he had papers in his pocket that was her adoption papers. The way Mrs. McEnnery talked about it, I understood that Maggie was to have their home property at their death. That conversation was about a month after I became acquainted with them, about twenty-four years ago."

Mrs. Melina Gibson:

"I knew William and Mrs. Mary McEnnery very well, lived by them twenty-one or twenty-two years. I never saw Maggie until she was grown up. Mrs. McEnnery said Maggie was their adopted daughter; that they had adopted her many years ago when they lived on the Pataha creek. She spoke of the papers as the adoption papers. She said Maggie would have their property when they were done with it. She was a woman who never told any of the particulars of a business. I never talked particularly with Mr. McEnnery, but he always spoke of Maggie as their adopted daughter and seemed to think a whole lot of her. He never said anything about Maggie and their property. They never spoke of Maggie very often."

Mrs. Leona E. Davis:

"I knew Mr. and Mrs. McEnnery. I was working for Mrs. Henry Day, and while I was there Mrs. McEnnery visited Mrs. Day and I overheard conversations between them in regard to Maggie. I heard Mrs. McEnnery say one day she had never had any babies, and a year ago she adopted a child. I heard a conversation one time where something was said about adoption papers, but that is all I could tell."

A. A. Owsley:

"I knew Mr. and Mrs. McEnnery when they lived on the Pataha, and know about the time they took the little girl. I think it was in the year '73 when I first saw the girl. I had talked with McEnnery regarding this girl. Bill said it was his child, but it was adopted, or going to be, that he was going to adopt it. He asked me about adopting the girl, and under what law he would have to adopt her. He wanted the papers made up so she would be his child legally, and would look after them when they got old. I had a conversation with him when he came back. He said he had agreed to take the child and raise her and give her a good education, and when he died she would heir their property. After she went to school, he told me that he had sent her there to give her a good education to

take care of them and their property and to be obe-
dient.  I have taken quite an interest in this case
and have talked to the neighbors about it.  I want to
see Maggie win out.  I consider it my duty to help
her.  Mrs. Milan and Mrs. Branton are my sisters
and we have talked about the case.  I have talked to
them about my evidence and they talked to me about
theirs."

Mrs. Grizelle Howe:

"I knew Mr. and Mrs. McEnnery in their lifetime
and had a conversation with Mrs. McEnnery regarding
Maggie at my house, and she said Maggie was her
adopted daughter; that she had it in writing; that they
were to take her and educate her and give her what
property they had at their death."

J. H. Long:

"I knew Mr. and Mrs. James Newman in their life-
time, near Dayton, Washington.  They came there in
1870, then went to California, and returned to the vi-
cinity of Dayton in the fall of 1871, or spring of 1872.
Mrs. Newman was my father's sister.  They had this
little girl with them when they arrived near Dayton.
They later let Mr. William McEnnery have this girl.
Their reason for doing so was that their little boy
treated her mean and disagreeably and they could not
get along together."

Hilda Rauch:

"I knew Mr. and Mrs. Newman when they resided
near Dayton.  Mrs. Newman was my father's sister.
They said they wanted a little girl as a companion
for the little boy, and they had this little girl when
they returned to the vicinity of Dayton.  They later
let Mr. William McEnnery take her to raise.  They
said the children did not get along well together and
thought she would have a better home with McEn-
nerys.  The McEnnerys were to take her and raise
her as their own and provide for her.  Mr. and Mrs.
James Newman are dead."

Other witnesses, acquaintances of long standing, were offered by respondent. William Buckley knew Mr. McEnnery in 1878. He was a near neighbor and visited back and forth. He heard the McEnnerys say that Maggie was their adopted daughter.

"They did not have any evidence of the adoption that I know of. They just said that she was their adopted daughter, and told me they got her some place over near Dayton. I never heard them say anything about their property, or that Maggie would receive it when they were dead and gone."

George Watson knew the McEnnerys in 1878, when he worked for them for about a year. He says that McEnnery told him that he had adopted the girl; that he had papers drawn up and

"that the papers bound this girl to them as their adopted daughter. They stated she was their heir and would inherit their property. I never saw any papers. Mr. McEnnery said she was to have the property when he got through with it, and I think it was Mrs. McEnnery told me he gave $20 for her."

J. E. Tupper says:

"I had a talk with Mr. McEnnery about Maggie. He spoke of her occasionally as his adopted daughter. I asked him why he was putting up so much house for himself and his wife, with no children, and he said his adopted daughter would have it. That was while I was working on the house. He didn't distinctly mention any writings, but said the lawyers would take care that his adopted daughter got his property."

Frank McBrierty heard the McEnnerys speak of respondent when they were living on the ranch on the Pataha.

"McEnnery said he got this girl and adopted her and was going to give her an education and raise her as his own; that they had all the papers drawn up. I don't recollect him saying anything as to whether

Maggie would receive his property when he was gone.''

But these conversations cannot be held to prove the terms of a written agreement entered into so long ago. They tend to prove nothing more than an attempted adoption, which we have found cannot be sustained in law.

''But the question whether relief should be granted or denied in a particular case addresses itself peculiarly to the conscience of the chancellor; and, before a plaintiff entitles himself to it, many considerations enter and are to be weighed . . . Where a contract such as this, resting in parol, and sought to be enforced after the death of the other party to it, comes before a court of equity for review, it is scrutinized with particular care, and only upon a satisfactory showing that it is definite and certain and just will it be enforced. The proofs of the contract should be clear, and the acts of the claimant referable alone to the contract.'' *Owens v. McNally,* 113 Cal. 444, 45 Pac. 710, 33 L. R. A. 369.

Keeping in mind that the action is upon a contract said to have been in writing, and that the right of respondent, if any, grows out of the written contract and not out of the relation of adoption, and that the terms of the contract must be supplied by oral testimony which must be clear and convincing, we are inclined to hold that the contract has not been established with that certainty that would warrant a court of equity in granting the relief prayed for.

Many of the witnesses were very young when the conversations which they attempt to detail were had, and when we consider that it is the habit of tradition in after years to take the form of spoken words; that the human mind cannot carry the exact spoken words of conversations had even on yesterday; that impressions, when put into words, generally voice the

feeling rather than the recollection of the witnesses, and that such testimony is the weakest known to the law, it would burden equity to the breaking point to exclude the contrary circumstances and the subsequent conduct of the parties and give ear only to alleged conversations repeated after forty to forty-five years.

"No species of testimony is more dangerous, or received with greater caution, than testimony to admissions in casual, loose or random conversations. The value of such testimony is infinitesimal when it is given after the lapse of years, or where the witness had no interest in the statements and no special motive for treasuring them up in his memory. 'The fact really is,' said Judge Fox of the United States District Court, 'that not one time in ten does a witness testify directly from positive remembrance of the language as spoken, but he clothes in his own words the idea which he then has of what he heard. It is seldom that a casual conversation is fixed so indelibly in our memory that we can repeat it verbatim months or years afterward; and I confess my suspicions are excited when I so frequently hear witnesses pretend so to do.' Citing *In re Gould,* Fed. Cas. No. 5,604." Moore, Facts, § 874.

"Alleged oral contracts to devise property have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them to the detriment and disinheriting of lawful heirs who otherwise would be entitled to the estate, and in enforcing them by specific performance when established. 'Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises,' said the New York Court of Appeals. 'They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents.'

"While such contracts are sometimes enforced by the courts, it is only when they have been established by evidence so strong and clear as to leave no doubt

and when the result of enforcing them would not be inequitable or unjust . . . Such contracts are dangerous. They threaten the security of estates, and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence." Id., § 47, citing *Hamlin v. Stevens,* 177 N. Y. 39, 69 N. E. 118.

"An oral declaration by the testator that he intended the plaintiff to have all his property, and the fact that the latter, who was his child, lived with him and rendered such services as are usually rendered by children when members of their father's family, are not enough." Underhill, Wills, § 292.

See, also, *Cessna v. Miller,* 85 Iowa 725, 51 N. W. 50; *Hamlin v. Stevens,* 117 N. Y. 39, 69 N. E. 118; *Haubrich v. Haubrich,* 118 Minn. 394, 136 N. W. 1025.

The case of *Holmes v. Connable,* 111 Iowa 298, 82 N. W. 780, seems to us to be very much the same on the facts and to the point in law. The court said:

"Before going into details, we wish, as already suggested, to say something as to the rules that should govern courts in passing upon cases of this kind. It will not do, as plaintiff's counsel seem to think proper, to hold that because a certain number of witnesses have testified to the making of the contract, and none have been called to deny it, plaintiff's case is established. The lips of the only two witnesses who could deny it are forever closed. The only person who could controvert the admissions alleged to have been made is the dead man against whose estate this claim is produced. There is no defense that can be made, save as it may be found in the improbability of the stories of the plaintiff's witnesses, when tested by comparison with other evidence in the case, or the ordinary rules of human conduct under similar circumstances."

In that case, as in this, a contract to give a share of the estate was relied on. Witnesses deposed that the

deceased person had stated that he intended to make the plaintiff an heir of his property the same as his other children; that "she knows and you know I promised to make her share equally with my children", and similar expressions. The court said:

"But, if we accord all honesty of purpose to such witnesses, it must be remembered that these are admissions made in random conversations. This court has said: 'Than this, no species of testimony is more dangerous, or received with greater caution'."

The strongest testimony in respondent's behalf is that of the witness Owsley. It most nearly concurred in point of time. According to this witness, McEnnery

"wanted the papers made up so she would be his child legally *and would look after them when they got old.* . . . He said Newman had adopted the child in California out of an orphans home. He said he had agreed to take the child and raise her and give her a good education, and when he died she would heir their property. . . . After she went to school, he told me he had sent her there to give her a good education to take care of them and their property and to be obedient."

But when this testimony is considered in connection with the testimony of other witnesses, which amounts to nothing more than words of expectation, it weakens, rather than strengthens, the case of respondent, for we find here terms and conditions that contradict the bold reliance of respondent. The motive of the contract was that respondent should care for the McEnnerys in their old age, and would receive an education "to take care of them and their property."

The witness Long, who was seventeen years of age in 1872, and a relative of the Newmans, and who talked with them about the child and the engagement of the McEnnerys, says nothing about a promise to leave

their property to respondent. In the testimony we find the motive of the Newmans. He says:

"They had this girl with them when they arrived near Dayton. They later let Mr. William McEnnery have this girl. Their reason for doing so was that their little boy treated her mean and disagreeably and they could not get along together."

When respondent married at about the age of 17, she, to all intents and purposes, passed out of the lives of the McEnnerys. She never saw them again, nor are we convinced that she ever had any correspondence with them. If so, it was at long intervals. The two or three letters offered as the letters of Mary McEnnery make no reference to a contract to leave her property to respondent. In *Holmes v. Connable, supra,* a mutilated letter, which was claimed to have made particular reference to a promise to will property, was rejected as suspicious, although it was quite as well sustained as the letters before us.

There is no testimony that presents were ever exchanged, or any words of greeting, on those occasions when the interest and affection of those who have interest and affection is prompted to manifest itself in deeds or words. There is no testimony that the children of respondent were ever brought in contact by letter or otherwise with the alleged foster parents. The record is void of all the courtesies and kindnesses that ordinarily attend the lives of those who have a mutual interest the one in the other. The want of these things, standing alone, may mean nothing, but they give emphasis to the improbability that the McEnnerys were reasserting a contract twenty and thirty years after the one claiming an adoption had passed out of their lives. If they were mindful of a contract to leave their property to respondent, is it not more

likely that they would have kept in touch with respondent as if she were indeed their daughter, and that their letters would have betrayed their intention. Instead, we are asked to decree performance of a contract upon an attempted proof of but one of its terms, and to presume that the service of seven years of infancy and dependence was the entire consideration for the promise.

That the McEnnerys did not bear in mind any contract to "leave" their property to respondent is evidenced by the fact that they executed mutual wills as late as the year 1900, in which they left all of their property the one to the other. Although, if any weight is to be given the letters which were introduced and which respondent says she received from Mrs. McEnnery, the old lady bore her the utmost good will, taking an interest in her family and personal affairs. Neither did the McEnnerys say anything of an adopted child, or a contract to leave their property to respondent, to the lawyer who drew the wills.

There is another bit of contradictory evidence, wholly negative it is true, but to be considered for what it is worth. It is an old note book which William McEnnery had as early as 1850, and in which he had entered some of the more important transactions of his life; his marriage, the death of relatives and friends, the purchase of land, etc., but no mention is made of any adoption or of a contract to leave his property to any one.

Respondent did not stand up well on cross-examination. She testified that she always called the McEnnerys father and mother, yet, when confronted by her own letters written when she was at the Sisters' school, she said that she called them father and mother until she went off to school, when Mrs. McEnnery

asked her to call her "aunt". A most unlikely thing, for the sending of a child away to school would tend to a closer affection, rather than a relaxation of the sentiment which the one who was childless and who had been called mother must have theretofore entertained, if the respondent's testimony be true. She betrayed other weaknesses, but upon a phase of the case which we have felt needs no discussion at this time.

An equity will be raised where the one who is alleged to have made the promise is under some moral obligation to support or make the child an heir, as, for instance, if the child be an illegitimate son, or where the child is denied the expectancy that attaches to parenthood; but here the respondent did not give up anything, either actual or prospective. The Newmans, so far as the record goes, were under no obligation to leave her anything, and the record affirms, rather than denies, the supposition that they had any motive to insist that the consideration for the contract was the leaving of any property to the respondent. The only burden that attaches to them was care and custody, and the testimony that is clear and convincing goes no further than to disclose a disposition to relieve themselves of their burden and to put it upon the McEnnerys.

"The facts alleged in the amended complaint are not such as to serve as a basis for a very strong appeal to the sense of justice of a court of equity, on the theory that there was such a change of conditions and relations on the part of plaintiffs, made in reliance on any promise or promises of the Fischers, that it would be a fraud upon them not to give them the Fischer property. When originally taken by the Fischers, they were orphan children aged respectively eleven and fourteen years, without a single relative on earth so far as appears, and without any friend or home except such as was afforded them by the charitable

institution of which they were inmates. They could expect nothing therefrom except such care, support, and education as are ordinarily afforded by such an institution, until such time as they might be placed in some family under such terms as the Fischers agreed to with the authorities of the institution. It is not to be assumed that they would have fared better in any other family than they did with the Fischers. They were furnished by the Fischers with a home until their respective marriages. So far as appears, they gave up and sacrificed absolutely nothing in the way of present or prospective advantage by remaining with the Fischers." *Baumann v. Kusian,* 164 Cal. 582, 129 Pac. 986, 44 L. R. A. (N. S.) 756.

We cannot review all the cases cited by counsel. It is enough to say that the court found, in each case relied on, that the contract had been proved by cogent and convincing evidence. It is the rule that each case of this kind must rest upon its own facts, and when this case is so considered, the proof is not convincing.

Reversed and remanded with directions to dismiss the suit.

MAIN, MACKINTOSH, MITCHELL, and TOLMAN, JJ., concur.