[No. 19442. Department Two. February 24, 1926.]

ROBERT L. FIELDS, *Appellant*, v. HESTER FIELDS,
*Respondent.*[1]

[1] ADOPTION (1-1)—BY CONTRACT—VALIDITY. An oral agreement to adopt a child without any adoption proceedings under the statute, is insufficient to give him any status as an heir entitled to inherit as an adopted son.

[2] SPECIFIC PERFORMANCE (25)—CONTRACTS ENFORCIBLE—CONTRACT TO DEVISE. An oral agreement with a natural father to adopt his son and make him an heir or leave him part of the adopter's property, testified to by one witness forty-five years after the event, is insufficient to establish an agreement enforcible in equity as one to will any part of the estate to such child, who was never legally adopted.

[3] SAME (25). In such a case, changed relations by the subsequent marriage of the promisor weighs heavily against the assertion of any such claim in equity.

Appeal from a judgment of the superior court for Asotin county, McCroskey, J., entered May 20, 1925, upon findings in favor of defendant, in an action for specific performance, tried to the court. Affirmed.

*C. H. Baldwin,* for appellant.

*John C. Applewhite* and *Will H. Fouts,* for respondent.

PARKER, J.—The plaintiff, Robert L. Fields, seeks to be decreed the owner of property left by his deceased foster father, Benjamin F. Fields, as against the claim thereto made by the defendant, Hester Fields, the second wife of Benjamin. This controversy came into the superior court for Asotin county as a suit in equity, when the estate of Benjamin was ready for distribution in the probate proceeding in which it was being administered in that court by Hester, as administra-

[1]Reported in 243 Pac. 369.

trix. While she was made a defendant as administratrix, as well as personally, and other possible heir claimants to the property were also made defendants, the only answer filed in the case was that made by her personally; and the case proceeded to trial upon the merits as a controversy between Robert and Hester only, upon the conclusion of which trial the superior court rendered its judgment denying the awarding to Robert of any of the property; from which judgment he has appealed to this court.

The allegations and prayer of Robert's complaint seem to plainly rest upon his claimed right in the property upon the sole theory that he is the son and heir of Benjamin and Mary, his first wife, by virtue of his legal adoption by them. The trial, however, proceeded not only upon that theory, but also upon the theory that there was an agreement made between the natural father of Robert and Benjamin and Mary, at the time Robert was given by the father to them in his early infancy, that they would not only take and adopt him as their own son, but would also by will leave their property to him upon their decease. We shall, for argument's sake, treat the pleadings as presenting both of these claims and as having been accordingly amended, though the record does not show any formal amendment in that behalf.

Robert was born near Dayton, in Columbia county, in the year 1875. His mother died very soon thereafter. The name of his father and mother was Crawford. When he was about three weeks old, he was taken by his father and placed in charge of Benjamin and Mary, who then lived in that county. They kept and cared for him during the following four years without any definite agreement with his father as to his final disposition. In the year 1879, his father came to the Fields' home for the purpose of taking him away, but

was then induced to leave him with Benjamin and Mary upon their agreeing that they would adopt him as their own son, they not having any children of their own blood. It is claimed by Robert that it was at that time further agreed between his father and Benjamin and Mary that they would leave their property to him upon their decease. Benjamin was then about forty years old, while Mary was some few years younger. We shall presently notice the evidence touching particularly this claimed further agreement. It is not claimed that either of these agreements was other than wholly oral.

There never were any adoption proceedings in this state looking to the formal legal adoption of Robert by Benjamin and Mary, as required by our statutes upon that subject. It is not claimed that there was ever any adoption effected outside this state. Indeed, all the parties have at all times since Robert's birth lived in this state during their respective lives. Robert was always thereafter known as Robert L. Fields. He was apparently referred to, for the most part thereafter, by Benjamin as "my boy," though often as "my son."

Robert continued to live in a rather marked degree of harmony with Benjamin and Mary until he was twenty-one years old. Benjamin and Mary were industrious and frugal farm and stock people. Robert developed the same qualities, having manifestly been well trained in the vocation of his foster parents. Upon arriving at maturity he began to acquire land and stock for himself. As to the extent he was aided therein by Benjamin and Mary, we are not advised. He seems to have continued to make his home with Benjamin and Mary, at least for many years thereafter. His relation with them after arriving at maturity, while very friendly as a matured son, was also as a business and working associate. He and Benjamin thereafter worked together, mingled their stock, and carried on their work

and business under such somewhat loosely defined
understanding as is not uncommon in such cases be-
tween father and son. They worked very harmoniously
and were prosperous. The evidence does not show,
with any degree of exactness, the wealth accumulated
by one as compared with the other; but, reading be-
tween the lines of this record, it seems highly probable
that Robert ultimately became possessed of property
somewhat nearly equal in value to that possessed by
Mary and Benjamin. They had moved from Columbia
county to Asotin county. Their property accumu-
lations seem to have been made largely in Asotin
county, and apparently all their property was in that
county, at least during the later years of their as-
sociation.

On November 28, 1910, Mary died intestate. Soon
thereafter Benjamin was, by the superior court for
Asotin county, duly appointed administrator of Mary's
estate and of their community estate, all of Benja-
min's and Mary's property being community prop-
erty. Robert made no claim in that administration
to any of Mary's portion of the community property
left by her, voluntarily conceding that Mary's com-
munity interest therein should go to her daughter, a
Mrs. Newby, by a former husband. Benjamin and
Mary never had any children of their own. On August
24, 1913, Benjamin was married again to Hester Fields,
this defendant. Robert did not thereafter make his
home with Benjamin and Hester, though there re-
mained bonds of affection between him and Benjamin
as between son and father, and he also has remained
on very friendly terms with Hester, seemingly even up
to the present time. While Hester knew generally of
the relation between Benjamin and Robert and knew
that there was no blood relationship between them,

she never knew that there was claimed to exist any agreement between Robert's natural father and Benjamin and Mary with reference to the leaving of any of the property of either of them to Robert upon their decease. Benjamin died intestate on July 9, 1923, in Asotin county. Thereafter Hester became administratrix of his estate, and upon the estate becoming ready for settlement and distribution, this suit was commenced by Robert resulting, following the trial, as we have above noticed.

We recur now to the evidence touching the question of Robert's natural father entering into an alleged agreement with Benjamin and Mary in 1879 by which they were to will their property to Robert. We have in this record only the testimony of a single witness, present at the alleged making of any such agreement. Reduced to narrative form, his testimony, in so far as need be here noticed, is as follows:

"I am 67 years old. I have lived in Asotin county for the last 30 or 40 years. I have known Benjamin ever since I can remember, must be towards 60 years. I worked for Benjamin when he and Mary lived near Dayton, and worked for him off and on thereafter. I knew a man there by the name of Crawford. I have known Robert Fields since he was about three weeks old in 1875 when he was turned over by Crawford to Benjamin and Mary. I was working for Benjamin on his ranch at that time. There was not much of a transaction at the time he was taken. His mother died and they fetched the child over to Benjamin's place. Four years after, his father came after him, and Benjamin and Mary got to thinking so much of him they hated to give him up, and finally his father says: 'I will give him to you and let you raise him.' The next day his father, with six or seven witnesses, came in and he gave the boy to Benjamin and his wife in their presence. He was to take him and raise him as his own child and educate and make him an heir.

"Q. Did he there in that conversation say that he was to make him his heir, and that Bob was to have his property at his death the same as his own child? A. I think so, yes. Q. Was there anything said about his taking the name of Fields in that conversation? A. No, sir; he was to raise him as his own child. I knew him after that as Robert Fields. Q. Did you ever hear a conversation between Benjamin and Mary concerning Mary's daughter in regard to the property? A. Several of them, yes. Robert was not present as they hardly even talked in front of him. Benjamin was to get part of the property and the daughter was to get her part. That was talked of and understood. (This seems to have been with reference to what should become of the property in case of Mary dying before Benjamin.) Mary said: 'My daughter will get my part of it and Robert will get Benjamin's part of it.' Benjamin's brother died in California. He was working out in the field and I took the telegram to him. He said: 'I intended to get down this fall and buy forty acres of land and make him a present. Being he is gone now, I want Robert to have it.' Q. What did Benjamin say about the child being taken? A. Well, they were to take him and raise him as their own child, and educate and make him an heir. Benjamin said that, in just about the words I have told you. His father asked him in front of these witnesses, he says: 'Now, will you take this boy as your own and educate him?' and he said he would. This conversation took place in 1879. Q. Is that conversation very clear in your memory? A. Pretty clear, yes. They were to take him and educate him as their own child; he was to get their property. They were to make him an heir. I do not know whether they used that word or part of the property. Q. What I am getting at is, was the word 'heir' used in that conversation? A. I think it was. Q. Then you say that Benjamin and his wife, notwithstanding the fact that they might yet have children along with this boy, agreed to give him all the property when they were dead? A. Well, they did not say all of the property but part of the property. It was not mentioned what part he was to get."

There is no other evidence in the record, as we read it, coming any more nearly supporting the making of an agreement by Benjamin or Mary to will any property to Robert than these quoted portions of this witness's testimony. There is no other evidence whatever in the record than this witness's testimony as to what conversation occurred between Robert's natural father and Benjamin and Mary at the time of the making of the alleged agreement in 1879. The testimony of this witness, it is worthy of note, was given at the trial of this case in October 1924, forty-five years after the alleged making of the agreement. There is some other testimony in the record indicating an intention on the part of Benjamin to have his property upon his death go to Robert, but this testimony, to our minds, goes no farther than an assumption on the part of Benjamin that his property would descend to Robert as his heir.

[1] It hardly needs argument at this time to demonstrate that Robert has no legal or equitable rights whatever as an heir of Benjamin. Our decisions in *In re Renton's Estate,* 10 Wash. 533, 39 Pac. 145, and *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631, are clearly decisive against him, in so far as his claim here made is rested upon the theory of heirship. Not having been adopted by Benjamin in the manner required by our adoption statutes, and there never having been recognized in this state any lawful method of adoption, other than by sanction of a probate court in territorial days or of a superior court since the beginning of statehood, evidenced by decree or order duly rendered by one or the other of such courts, Robert has no standing whatever as a legally adopted son of Benjamin. Rem. Comp. Stat., §§ 1696-1699. In *In re Renton's Estate, supra,* Judge Stiles, speaking for the court, said:

"Without a statute, or without compliance with a statute, there is no such thing in our law as the adoption of an heir. Adoption was not known to the common law, and is a matter purely statutory. Courts have passed upon this question frequently, and have adhered with much strictness to this rule."

In *Wall v. McEnnery's Estate, supra,* the question of the legality of an attempted adoption, other than by confirmation thereof by formal order of court, was re-examined at length in the light of numerous authorities, and the view that there could be no lawful adoption other than by confirmation thereof by order of court, as provided by our adoption statutes, was adhered to. We deem it unnecessary to pursue this inquiry farther, and feel constrained to now hold that there never was any effectual adoption of Robert by Benjamin, as required by our adoption statutes, and that, therefore, Robert has never acquired any right in any of the property of Benjamin as his heir.

[2] Was there proven with that degree of certainty required in such cases an agreement between the natural father of Robert and his foster father Benjamin in 1879, as claimed, which is enforcible in equity as an agreement on the part of Benjamin to will any of his property to Robert? We are clearly of the opinion that there was not. Indeed, we cannot see in the conversation had in 1875 between the natural father of Robert and his foster father Benjamin, which is claimed to constitute such an agreement, anything more than an agreement that Robert should be adopted by Benjamin as his son, with a view of making it possible for Robert to acquire an inheritance right as the heir of Benjamin; which agreement so viewed, as we have seen, has wholly failed to be effectual in law because not consummated or sanctioned by order of court, as required by our adoption statutes. It

seems to us that the evidence in this record not only fails to show any agreement by Benjamin to will his property, or any interest therein, to Robert, but that it comes nearly affirmatively showing to the contrary; that is, that Benjamin did not in 1879, at the time of the alleged making of the agreement, or at any time thereafter, evidence any intent whatever to make a will. The evidence shows that on occasions when the making of a will was suggested to him, he always expressed a clear intent not to make a will. He manifestly never entertained any intent with reference to Robert succeeding to any interest in his property other than a possible intent, or rather an assumption, that Robert would, as a matter of law, have some rights as his heir.

While this court has recognized the validity and enforcibility in equity of agreements to will property, if made in writing and supported by sufficient consideration, and even if made orally and supported by sufficient consideration and sufficient part performance to avoid the restraining effect of our statute of frauds, this court has never recognized the enforcibility in equity of an agreement to will property resting upon as frail foundation, as to the certainty of its making, as this alleged agreement of 1879 is sought to be rested upon. The version of the making of the agreement to will, as testified to by the one witness, is not only uncertain within itself, but is further impaired by the lapse of forty-five years from the time of the making of the alleged agreement to the giving of this somewhat uncertain version of it by the one witness.

[3] A further weighty consideration against the claim here made by Robert, as we view it, is the changed condition coming into the life of Benjamin by his marriage to Hester in 1913, who continued thereafter, for a period of ten years, to live with him as his wife,

and who thereby legally acquired a clear right of inheritance in his property. This right, we are convinced, should not be allowed to be impaired by the uncertain proof of the alleged agreement by Benjamin to will his property to Robert, claimed to have been made thirty-five years before her marriage to Benjamin and forty-five years before she ever learned of any claim that any such agreement had been made. This is a consideration weighing heavily in favor of Hester. Indeed, it might well be argued as conclusive in her favor, even if the agreement on the part of Benjamin to will property to Robert had been certainly proven as having been made long before her marriage to Benjamin. This thought was learnedly expounded by the supreme court of California in *Owens v. McNally,* 113 Cal. 444, 45 Pac. 710, cited with approval in our decisions in *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631, and in *In re Arland's Estate,* 131 Wash. 297, 230 Pac. 157. We are clearly of the opinion that there cannot be awarded to Robert any interest in the estate of Benjamin upon the theory of an agreement having been made by Benjamin to will property to Robert.

The judgment of the superior court is affirmed.

TOLMAN, C. J., MAIN, MITCHELL, and MACKINTOSH, JJ., concur.