[No. 22695. Department One. January 7, 1932.]

MARGUERITE TITUS WHITAKER, *Respondent*, v. JESSIE EDNA TITUS, *as Executrix, et al., Appellants.*[1]

[1]Reported in 6 P. (2d) 649.

226

*S. Edelstein,* for appellant.
*Graves, Kizer & Graves,* for respondent.

BEELER, J.—The respondent brought this action to impress upon certain lands in Whitman county and upon a part of the proceeds of an executory contract for the sale of these lands, a trust in her favor as against the appellant, Jessie Edna Titus, in her own right and as executrix of the last will of Stanley H. Titus, deceased, and to compel a conveyance of the property by the appellant to the respondent. The Fidelity Savings & Loan Association was joined as a defendant because it held in escrow the executory contract of sale, upon which it was expected payments would be made, during the pendency of this action. Frances Geselchen presumably was made a party defendant because her interest as legatee under the will of Stanley H. Titus might be adversely affected by a decree in favor of the respondent.

Stanley H. Titus, a physician and surgeon who practiced in Spokane for many years, was a brother of the respondent. She alleged in her complaint that their mother, Ellen Titus, had owned the lands in controversy, and on October 3, 1923, had agreed to sell the lands under an executory contract of sale to one Tate and wife; that, by a deed dated January 10, 1924, acknowledged January 14, 1924, Ellen Titus conveyed the lands to the respondent and her brother Stanley, subject to the contract to Tate and wife, and by an instrument dated and acknowledged January 14, 1924, assigned to them her right to receive the unpaid part of the purchase price; that the respondent and Stanley thereupon executed and deposited with the escrow holder their deed of the lands to Tate and wife, for delivery to them when they should have fully performed their contract of purchase.

The respondent further alleged that the deed and the assignment from her mother to herself were intended as an absolute gift of one-half of the lands and of the money that would be paid on the contract; but that, as to Stanley, she imposed as a condition to making the gift that he should irrevocably devise and bequeath to the respondent, if his death should occur before hers, the one-half interest in the lands and the contract so to be conveyed to him by his mother; that this condition was imposed by the mother for the benefit of the respondent, and that Stanley agreed to meet the condition, and immediately executed and delivered to his mother on January 14, 1924, a will whereby he devised and bequeathed to the respondent his residuary estate, which, had he died then, would have included his one-half of the lands and the proceeds of the contract.

It was also alleged in the complaint that, at the time of the transaction just mentioned, Stanley's wife was Eleanor, but that they were estranged and were living apart and that later they were divorced, the final decree having been entered January 22, 1927, and that Eleanor Titus did not have or claim any right or interest in the property of Stanley Titus; that, immediately after the divorce, Stanley Titus married the defendant Jessie Edna Titus; that he died April 23, 1929, leaving a will dated January 30, 1928, which was admitted to probate by the superior court for Spokane county on May 20, 1929; and that, by this will, the residuary estate, including a one-half interest in the lands and the contract in dispute, were given to the defendant Jessie Edna Titus, who claims the right to administer upon the lands and the contract and ultimately to receive them upon distribution as a part of the residuary estate.

The prayer of the complaint is that the defendant

Jessie Edna Titus be declared to hold the apparent interest of the testator in the lands and the contract in trust for the respondent and that a conveyance of the property be compelled accordingly.

The answer of Jessie Edna Titus, individually and as executrix (the only answer in the record here), admitted all of the allegations of the complaint except those to the effect that the gifts by Ellen Titus to the respondent and Stanley were gifts *in praesenti;* that the gift to Stanley was conditioned that he pass the property by will to the respondent if she survived him; that Stanley promised so to pass the property; and that he executed his will January 14, 1924, to meet such a condition or fulfill such a promise.

It was pleaded affirmatively in the answer that, *if* there was a contract between Ellen Titus and Stanley that the latter should make a will in favor of the respondent, the contract was oral and hence void under the statute of frauds. It was also alleged affirmatively that the conveyances made by Ellen Titus to the respondent and Stanley Titus about January 14, 1924, were not to take effect in possession and enjoyment by the grantees until the death of the grantor, and that the grantor did in fact reserve and actually receive for the rest of her life all benefits derived from the lands conveyed and all payments made by Tate and wife upon the contract of sale; that the conveyances by Ellen Titus to the respondent and Stanley Titus were made at the instance of the respondent and her husband, Fred J. Whitaker, for the purpose of obviating probate proceedings upon the estate of Ellen Titus and evading the payment of inheritance taxes to the state and estate taxes to the United States; that, without those conveyances, there would have accrued to the state and the United States substantial sums as inheritance and estate taxes; and that, by reason of such

evasion of taxes, accomplished at the instance and with the help of the respondent, she did not come into court with clean hands.

The reply put in issue the material allegations of the answer.

The superior court, after a somewhat lengthy trial without a jury, found facts and decreed as follows:

"(1) That on the 14th day of January, 1924, one Ellen Titus, now deceased, did execute and deliver to the said Stanley H. Titus and this plaintiff, Marguerite Titus Whitaker, her certain deed of date January 10, 1924, filed for record in the auditor's office of Whitman county, in this state, on the 18th day of January, 1924, conveying to the said Stanley H. Titus and the said Marguerite Titus Whitaker, this plaintiff, the following described real estate to wit: [Description of about 600 acres of land in Whitman county, Washington].

"(2) That on the said 14th day of January, 1924, and before the execution and delivery of said deed, and as a consideration therefor, it was agreed and promised by the said Stanley H. Titus to the said Ellen Titus that he would take and hold the undivided one-half interest in said real estate conveyed to him by said deed for and during his natural lifetime, and that he would devise to the said Marguerite Titus Whitaker, this plaintiff, his undivided one-half interest therein, to the end that, upon his death, his interest in said real estate should pass to her in fee simple; and thereupon and on said date and before the execution of said deed, in execution and evidence of said agreement on his part, he did execute his certain will and testament wherein and whereby, amongst other things, he devised the said real estate to this plaintiff, and then and there delivered the same to Frederick J. Whitaker, the husband of this plaintiff, for her, and it was by him thereafter delivered to her. By virtue of said deed and of said contract and agreement, the said Stanley H. Titus took said estate in trust for his own use and enjoyment during his natural lifetime, and to

devise the same to this plaintiff and not otherwise; which said trust is hereby decreed and established.

"(3) That on said date there was outstanding a certain contract between the said Ellen Titus, now deceased, and one W. P. Tate and Gladys E. Tate, his wife, then in escrow with the defendant Fidelity Savings & Loan Association, by the terms of which the said Ellen Titus had contracted to sell, on certain terms and conditions as to deferred payments, to the said W. P. Tate and Gladys E. Tate his wife, said real estate, and on the 14th day of January, 1924, the said Ellen Titus did execute and deliver a certain instrument of assignment whereby she assigned, transferred and set over to the said Stanley H. Titus and Marguerite Titus Whitaker, this plaintiff, said contract and all of her right, title and interest in and to the same by said instrument, further giving them full power to collect on the same as fully and completely as she could herself do; and said instrument of assignment further recited that she had that date deeded said real estate to the said Stanley H. Titus and Marguerite Titus Whitaker, this plaintiff, and that this assignment was made for the purpose of enabling them to collect upon said contract, and to authorize them to receipt for payments therefor as fully as she could herself do if this assignment had not been made. Said assignment by said Ellen Titus as to the one-half interest assigned therein to the said Stanley H. Titus was made upon the same contract and condition and upon the same trust, and not otherwise, as the contract and trust theretofore found in respect of said real estate; which said trust is hereby decreed and established.

"(4) That the devise to the defendant Jessie Edna Titus by the will of the said Stanley H. Titus admitted to probate in this county on May 20, 1929, in so far as it covers or includes the said real estate or the payments covered by the said assignment, is in violation of said trust, and the defendant Jessie Edna Titus took and now holds title to said real estate and to said payments on the same trust as heretofore decreed and established and not otherwise, and that as executrix of

said will she is administering the same subject to the same trust and not otherwise.

"(5) That defendant Jessie Edna Titus in her own proper person and as executrix of the last will and testament of the said Stanley H. Titus, deceased, shall, and is hereby directed and decreed, within thirty days from the date of this decree to convey to the plaintiff by good and sufficient deed of quitclaim all her right, title and interest in and to said real estate or any part thereof, both in her own proper right and as executrix of said will; and that she shall, and is hereby directed and decreed, likewise within the same time, by a proper instrument of assignment, both in her own proper person and as such executrix, to transfer, set over and assign to plaintiff all her right, title and interest held or claimed to be held by her, both in her own proper right and as executrix aforesaid of her right, title and interest in and to the aforesaid assignment, and in and to all moneys collected thereunder, and by virtue of the said Tate contract since the death of the said Stanley H. Titus, and all moneys which may hereafter be paid by the said Tate under said contract, together with full power to the said plaintiff to collect on the same as fully and completely as she either in her own proper right or as executrix aforesaid might do.

"(6) That upon the making of said deed by defendant Jessie Edna Titus, or in case of her default therein, by a commissioner to be appointed by this court according to law, the full and perfect title in fee simple to said real estate shall be vested in Marguerite Titus Whitaker, the plaintiff herein, to the extent it vested in the said Stanley H. Titus by the said deed from Ellen Titus to him, but discharged of the trust heretofore decreed and established. That upon the making of said assignment by the defendant Jessie Edna Titus, full title to all payments under the said Tate contract, made since the death of said Stanley H. Titus or which may hereafter be made thereunder shall vest in the plaintiff, Marguerite Titus Whitaker, together with the rights, privileges and powers to enforce the said Tate contract and to any and all remedies in respect thereof which were assigned by the aforesaid assign-

ment of Ellen Titus to said Stanley H. Titus and this plaintiff, of date January 14, 1924. In default of the execution of the above decreed instrument of assignment by defendant Jessie Edna Titus, this judgment hereby establishes and vests in plaintiff all of the rights, title, interest and powers heretofore decreed to be established by said decreed assignment.

"(7) That the defendant Fidelity Savings & Loan Association pay over to this plaintiff, Marguerite Titus Whitaker, all moneys now in its hands derived from payments of the said Tate contract. That it shall pay over to her likewise all moneys which shall hereafter come into its hands deriving from the said Tate contract. That it is hereby perpetually enjoined from paying any of said moneys to the defendant Jessie Edna Titus, either in her own proper person or as executrix of the will and testament of Stanley H. Titus, deceased, or to any other person claiming through, by or under her or under said will."

This appeal was from the foregoing judgment. The appellant has stated eleven assignments of error and discussed them in six groups, those in the last group going to the merits, that is, to the question whether any contract to devise and bequeath was ever made at all by Stanley H. Titus. Of the five questions of law thus presented, four are based upon alleged errors in the admission and rejection of testimony; but, in the view we take of the case, the admitted testimony does the appellant no harm, and the rejected testimony she does not need. Hence, we shall not trouble to state the points.

The remaining point of law, namely, that an express trust in real property cannot be established by parol, need not be considered, since thorough study and consideration of all of the evidence has led us to a conclusion opposite that reached by the trial judge upon the one vital question of fact in the controversy, namely: *Was there on January 14, 1924, an agreement*

*made by Ellen Titus and her son, Stanley H. Titus, to the effect that the latter, in consideration of the deed and assignment then made by her to him, should irrevocably devise and bequeath to his sister, the respondent, the property acquired by those conveyances?*

In reaching this conclusion, we have given due weight to the views of the evidence apparently entertained by the trial judge, especially as to those indicated by his written memorandum of opinion on the merits of the case. And we may observe here that it seems to us that the trial judge reached the conclusion he did by failing to give to certain admitted or all but indisputable facts and circumstances the weight that ought to be given them.

The character of Ellen Titus, the mother of the respondent and of Stanley H. Titus, and her attitude toward her children and grandchildren, are of such importance in considering much of the evidence that more will have to be said concerning her life and family relations than would ordinarily be required.

She was born in county Sligo, Ireland, and migrated to the United States when she was sixteen or seventeen years of age. She was married in New York city in 1877, and moved with her husband in the spring of the year 1878 to Whitman county, in this state. There they acquired, by homesteading and otherwise, the lands involved in this action, upon which they lived and farmed for many years. Three children were born to them—Joseph, in 1878; Stanley H., on August 18, 1883; and Marguerite, the respondent in this action, in January, 1887.

The family was very poor at first, but through industry, thrift and good management became comfortably circumstanced and ultimately fairly prosperous.

The credit for this success was due chiefly, if not entirely, to Ellen Titus. She is described by her daughter, the respondent here, as having been religious, industrious, thrifty, a good manager and disciplinarian, firm and confident in handling matters of business, self-sacrificing for the other members of the family, and proud of her children and very ambitious for their success.

She succeeded in holding the family together on the farm until Stanley was attending a medical school in the east—probably about the year 1905—when the farm was rented. Apparently the farm was never thereafter used as a family home. Within a year or two after that time, Ellen Titus procured a divorce from her husband. From 1907 until 1923, she lived in homes of her own in Spokane, and from 1923 until her death on January 21, 1928, she resided at the home of the respondent and her husband, Dr. Fred J. Whitaker, in Spokane.

Joseph Titus, the eldest child of Ellen Titus, died about 1914, leaving three children, daughters, whose ages ranged between eleven and sixteen years. The burden of the care and education of these children fell largely upon the shoulders of their grandmother, who was very fond of them and took them into her home and cared for and educated them to the best of her ability as long as they would remain with her.

Touching the attitude of Ellen Titus toward her own children, and especially toward Stanley, we quote the following paragraphs from the respondent's brief, which will also serve to describe Stanley himself, though with considerable exaggeration:

"Mother Titus was fond of all her children and ambitious for their future. She was determined that they should have all that she had never had. To that end they were sent to school and then college. Stanley was

the pride of his mother's heart. He was tall, handsome, fine-looking, with beautiful manners and that suavity of speech that is the birthright of the Irish. He was very particular about his clothes and had the knack of making a splendid appearance. To all this was added a lovable personality that gave him popularity with men and women. To say that Mother Titus adored this gorgeous, dashing son, seeing him possessed of all she lacked and admired, is to state the case too mildly. Her pride and ambition must have pictured him, at his graduation from medical school, as at the summit of his profession with an adulatory world at his feet.

"Stanley, at first, seemed likely to be in fact what his mother hoped for him. He was a brilliant surgeon. He was sought after by society and his income quickly became very large. He was a fine athlete. In school he had played football, and after school he played golf and polo. [That he was fond of hunting and fishing and yachting, might have been included here.] But the fair promise was not to be. At the age of thirty-five, something begins to eat up the splendid body and to destroy the vigorous health. The statement of facts is replete with his various illnesses. Between the age of thirty-five and forty-five, the tall, handsome athlete finds it necessary to spend six winters in the south for his health. He is twice in Florida, twice in Arizona, once in Coronado and once in Honolulu. Finally, he died on April 23, 1929, at the age of forty-five."

In 1919, Ellen Titus, by an executory contract dated October 23, of that year, agreed to sell the Whitman county lands to one Fields for $97,200, twenty-five thousand dollars to be paid upon the execution of the contract and the rest in installments over a period of ten years. Out of the down payment, she gave twenty-one thousand dollars in equal shares to the respondent and Stanley, about December 9, 1919.

On May 25, 1923, Mrs. Titus executed a will whereby, after providing for a trust fund for the benefit of the

three daughters of her deceased son, she gave the residue of her estate to the respondent and Stanley in equal shares, appointing them executors to administer the estate without the intervention of the court and without giving bonds. This was the only will Mrs. Titus ever made. She was then about sixty-six years of age, and a short time before had been seriously ill. About five months thereafter, she took up her home with the respondent and her husband. The terms of the will, before its execution, were fully discussed with the respondent and her husband and Stanley, all of whom were satisfied with the terms. This will was never probated (for reasons that will appear later), but it was never destroyed or revoked by the testatrix, and it is in evidence as an exhibit in this case.

After May 13, 1926, the will was placed in a safe-deposit box known as C-215 in the vaults of the Old National Bank & Union Trust Company in Spokane, where it remained until after the death of the testatrix. On the date mentioned, the box was rented by Ellen Titus in the name of the respondent, though the latter never entered the box in her mother's absence except during the mother's last illness in December, 1927, and January, 1928.

By an instrument dated October 3, 1923, acknowledged the 14th day of December following, a revision was made of the contract for the sale of the Whitman county lands. Fields and wife having assigned their interest to Tate, the revised contract was between Ellen Titus as vendor and Tate and wife as vendees. The details of the changes are not material. It is enough to say that the rate of interest was reduced and the terms of payment of both principal and interest were made easier for the vendees, and that the

revised contract and a deed from the vendor to the vendees were placed as an escrow with Fidelity Savings & Loan Association, of Spokane.

On January 14, 1924, Ellen Titus acknowledged and delivered to the respondent and Stanley a deed, dated January 10, 1924, purporting to convey to them absolutely the lands in controversy, and at the same time she executed, acknowledged and delivered to them an assignment, absolute on its face, of all her title and interest in the contract of sale, authorizing them to receive the money to be paid thereunder. These two instruments, together with a quitclaim deed from the respondent and Stanley to Tate and wife, dated January 15, 1924, and acknowledged the 16th, were placed with the contract in escrow with Fidelity Savings & Loan Association. The deed from Mrs. Titus to her children was recorded January 18, 1924, at the request of the escrow holder. The acknowledgments of these three instruments were taken by Lawrence Jack, who was the attorney who drafted them, and who drafted and was one of the witnesses to the will about to be mentioned. None of the three instruments refers to any will or to any agreement to devise or bequeath anything.

Stanley H. Titus executed a will on January 14, 1924, wherein the following recitals occurred:

"(2) My family at this time consist of myself and my wife Eleanor Titus. My wife, Eleanor Titus, has a son by a previous marriage, of the age of ten years, being named John Miller.

"(3) My said wife and myself are not living together, and have no community property or community ownership of any kind. The property which I have at this time is my separate property, either earned by me prior to my marriage and since my wife ceased to live with me, the separation occurring on or about November 1, 1923, and property obtained by me by

gift and devise and descent. From the time of our marriage until the time of our separation, our community expenditures exceeded our earnings and we have never had any community property. Furthermore, my said wife is wealthy in her own right, and therefore it is my desire that my property shall be disposed of as herein set forth.''

Then followed bequests to the respondent's husband, Dr. Fred J. Whitaker, and to the testator's nieces, daughters of his deceased brother, and to the defendant Frances Geselchen, who had been the testator's office assistant for many years. Following these, was a gift of the residue of the testator's estate to the respondent. Finally, the testator appointed Dr. Fred J. Whitaker executor of the will to serve without bond and to administer the estate without the intervention of the court. The will made no reference to any agreement to devise or bequeath anything to the respondent, nor did it specifically mention or in any way refer to the property conveyed to the testator by his mother on the day of its date.

This will, when executed, was placed in a vault used jointly by Dr. Whitaker and the testator, but later, upon the termination of the joint office arrangement that had existed between them since 1920, the will was delivered by Dr. Whitaker to the respondent, who placed it in a safe-deposit box C-215 above mentioned. Here it remained until after the death of Ellen Titus, when on May 17, 1928, in the course of a division between the respondent and Stanley of the residue of the estate of their mother, it was surrendered by the respondent to Stanley. The will was never offered for probate, but it is in evidence as an exhibit in this case.

Out of the transactions that occurred on and about January 14, 1924, grew the claim asserted by the respondent in this action. No written evidence has been

produced, or ever existed, that Stanley H. Titus agreed with his mother irrevocably to devise and bequeath to the respondent the property in controversy. The respondent's claim is founded upon an alleged parol agreement to that effect between Stanley and his mother made on January 14, 1924, before the actual delivery of the deed and assignment executed on that day, and before the drafting and execution of Stanley's will.

The agreement is sought to be proved by the oral testimony of the respondent's husband, Dr. Fred J. Whitaker, reciting a conversation that occurred at his home in the mother's room at which only she and her son and Dr. Whitaker were present. This testimony, with its setting, as it was first elicited on direct examination, appears in the record as follows:

"Q. Doctor Whitaker, did you know Mrs. Ellen Titus in her lifetime? A. I did, yes. Q. You knew her all the years after you entered the family I suppose? A. I have known the family for more than thirty years; thirty-five, I think. Q. How long have you been married? A. Twenty years. Q. Now, had Mrs. Titus lived at your house for a time before her death? A. She had, yes. Q. About how long a time? A. About four years, I think. Q. She was living there at the time this deed was made, was she? A. Yes, sir. Q. Had she been living there long then? A. From the fall before, I think. Q. Now, Doctor Whitaker, during the later years of her life, both after she came to live with you and before, I presume that the fact of the consideration of her property and Stanley's way of living and all that sort of thing was generally talked about, there was general talk along that line? A. Yes. Q. All right, kindly state it.

"MR. EDELSTEIN: I make the same objection that I made before. (Objection overruled. Defendant excepted.)

"A. Over a good many—a period of years she always talked about wanting her property to stay in the

family. Are you directing me now to the time that deed was made? Q. No, I haven't got to that yet, but what did she say about Stanley's way of living and his women, and so on? A. She always deplored that. Q. Did she talk about it a great deal? A. Yes, it was on her mind a great deal. Q. All right. Now, coming to the transaction in question: Tell us how it came up and exactly what happened and what was said and what was done in your presence.

"MR. EDELSTEIN: The same objection, Your Honor. (Objection overruled. Defendant excepted.)

"A. Well, first she made a will, and following that —I think just a short time before that she had been sick for a while and she decided that she wanted to deed the property, and she asked Stanley to come out to the house, she wanted to talk with him, and she said then—she said Stanley— Q. Who was present? A. Dr. Titus, Mrs. Titus, and myself. Q. All right. A. *She said 'Stanley, I have worked hard all my life for what I have, and I don't want those sluts of yours spending my money when I am gone,' and she said, 'Unless you promise me that Marguerite shall have this property, I am going to deed it all to Marguerite.' And 'I am signing that deed today.' And Stanley said, 'Well, Mamma, I don't want anyone else but Marguerite to have that property, and to satisfy you that I mean that I will make a will today,' and he did; he made a will that day.*" (Italics ours.)

"Q. Now what else was said in that conversation about having this thing—about making up a trust fund or something of that sort? A. Oh, she said that that fund must be made up to what she intended to leave for the girls, the granddaughters. Q. How much did she say it would take, in addition to what she had, out of this fund, do you recall? A. If I remember correctly, there was about twelve thousand dollars on hand at that time. It would take about three thousand more. I am not positive about that, but that is my recollection of it. Q. All right. Doctor, what was done about making the will and signing the deed? A. Well, she signed the deed, and Dr. Titus went down to attorney Jack and had him draw up that will, and he

signed it and gave it to me. Q. Did Mrs. Titus go down to Lawrence Jack's office to sign the deed, or did he bring it up there, do you recall? A. I think a Mr. Morton brought it out to the house, and it was signed there. He was an attorney. Q. The will that he gave you; is that the will, Doctor? (Showing the witness plaintiff's Exhibit No. 7.) A. Yes, sir. Q. When he gave you that will did he say anything about it or make any comments that you recall, or just give it to you? A. Well, I talked to him about it before he made it. Q. I forgot that. Now what was that conversation? A. He said that he intended to leave Miss Geselchen five thousand dollars, and I told him I felt he should leave something to his brother's daughters, and we talked about that, and he finally decided to leave them five hundred dollars apiece, and to reduce Miss Geselchen's amount to thirty-five hundred dollars. Q. This money that he was leaving to his nieces and to Miss Geselchen was his own money, and had nothing to do with the money he was getting from his mother, had it? A. No it had not.

"Q. When he gave you the will, what did you do with it? A. I put it in a box that I had in the vault in the office. Q. Did anybody share that box with you? A. I had some of Mrs. Titus' papers in there. Q. Did Stanley have access to it? A. He had stuff in the vault. It was the vault in connection with the office. Anybody that went in there had access to it. Q. Was that where you put the will? A. Yes. Q. How long did it remain there? A. Till I moved out of that office. Q. Do you know when that was? A. I think it was May, 1926. Q. Then what did you do with it? A. I put it in the vault that I had upstairs in that building, after I moved out. Q. Did you at any time give it to Mrs. Whitaker? A. I did later, yes sir. Q. When was that? A. After Doctor Titus and I gave up the vault which we had together in the Union Trust Company. Then I gave it to her. She and her mother had a box together, and I gave it to her, and it was put in that box. Q. Did anybody ever give you a copy of that will? A. Yes, sir. Q. Who? A. Attorney Jack, who wrote it. Q. He gave you an unexecuted copy? A.

Yes, sir. Q. And you have had that ever since? A. Yes. Q. Is this the first time you have seen the original of this since you gave it to Mrs. Whitaker? A. It is, yes.''

The situation thus presented requires that this testimony—in fact all of the testimony of this witness and all of the facts and circumstances in the case bearing upon the transactions that occurred between January 10 and January 18, 1924—be given the closest scrutiny. Of the three persons said to have been present at the interview during which the alleged conversation occurred, two are dead—Mother Titus and Stanley. Mr. Jack, the attorney who drafted all of the documents executed by the parties on and about the date of the alleged conversation, and who in all probability knew what purpose the documents were intended to accomplish, is also dead. Only Dr. Whitaker, the witness, is left, and he is the husband of her who would benefit to the extent of more than thirty thousand dollars by an acceptance of his version of a conversation that took place more than four years before he had occasion to refresh his recollection of it, and six years before he was called upon to recount it in court.

Let us consider first Mr. Jack's relation to these transactions. He was not, apparently, the attorney whom Ellen Titus ordinarily consulted, but he had done some legal work for her, including the drafting of the contract of sale to Tate. As early as January 10th, he drafted the deed from Ellen Titus to her two children; so that she must have conferred with him on that day or earlier. On January 11th she drew a check to the order of Mr. Jack's law firm for fifteen dollars, which, so far as appears, could have been for no other purpose than to pay for his advice and services in connection with some or all of the transactions now under consideration. On January 14th, she acknowledged that

deed before him as a notary public and he drafted and took her acknowledgment of the assignment of the Tate contract. On the same day, for Stanley Titus, he drafted and witnessed the execution of the will upon which the respondent relies, and the respondent's husband was present at the consultation that preceded the preparation of the will. On January 15th, Mr. Jack drafted the deed from the respondent and her brother to Tate and wife, and on the 16th he took their acknowledgment to it.

Thus, on at least four different days within a period of not less than one week, an attorney-at-law to whom all parties concerned were willing to entrust their legal business was seen or consulted about the transaction in which the respondent and her mother and brother were engaged. It would be passing strange if they or some of them or Dr. Whitaker did not inform Mr. Jack of the purposes to be accomplished; and if what the respondent now contends for was one of those purposes—a purpose likely to require many years to carry out—it is hardly conceivable that he would have left the evidence of it resting wholly in parol, with two of the documents implying a contrary intent.

The respondent and her husband testified emphatically, and each stoutly maintained throughout the trial, that, after the transactions of January 14, 1924, all of the moneys thereafter to be paid on the land contract were to belong to the respondent and her brother, and that the moneys that were thereafter paid by Tate did in fact become their property, just as the deed and assignment contemplated. Bank accounts, paid checks, and other written evidence, however, as well as many circumstances and acts of the parties, belie this testimony.

There is abundant written evidence to prove conclusively that, after the transaction of January 14,

1924, and thereabouts, money paid by Tate on the land contract was received, either directly or indirectly, by Ellen Titus during the rest of her lifetime (she died January 21, 1928). The first payment that accrued or was made after January 14, 1924, was paid by a check drawn to the order of Ellen Titus, sent by Tate to the escrow holder, and by it transmitted to Mrs. Titus, who deposited it in her own bank account in the usual way. Thereafter, Tate was informed of the deed and assignment from Ellen Titus to her children, and therefore he made subsequent payments, either directly or through the escrow holder, by checks to the respondent and Stanley, who uniformly, however, endorsed and delivered the checks to their mother, who deposited them in her bank account. All sums paid by Tate prior to the death of Ellen Titus were for interest on the unpaid part of the purchase price, except that on October 14, 1927, he paid one thousand dollars on account of principal.

The bank account of Mrs. Titus was one she had kept since March, 1908, in the Spokane State Bank, with which she did her general banking business. The account was continued until her death. From the opening of the account until April 13, 1926, the respondent had authority to draw checks upon it as her mother's attorney-in-fact, but the power was never exercised. On April 13, 1926, the account was changed to a joint and several account of Ellen Titus and the respondent, but the latter never drew upon it during her mother's lifetime. In short, the account was treated throughout as that of the mother alone, and the moneys that were deposited in it and withdrawn from it were considered to be hers alone. She used what was required for her personal needs and for such other purposes as pleased her, and whenever there was a sufficient surplus for investment, she would buy a bond or similar security.

On April 13, 1926, the day on which the bank account was changed to a joint and several account, Ellen Titus deposited with the Union Trust Company of Spokane bonds of the par value of fifteen thousand. dollars, to constitute a trust fund for the benefit of her three grandchildren, the children of her deceased son Joseph. The terms of the trust, as evidenced by a declaration executed the following day, were similar to the terms of the trust contemplated by her will for the same beneficiaries. While she lived, she was to receive the income from the securities as well as any profits arising, upon sales or exchanges, from enhancement in their values, and she was to make good any losses resulting from depreciation in value; and these provisions were carried out during the rest of the life of the trustor.

The moneys she received from the trust were deposited in the joint and several account in the Spokane State Bank. Upon the death of the trustor, on January 21, 1928, the trustee computed the unpaid interest accrued to that date and drew its check for the amount —$660.47—payable to the order of the trustor, and delivered it to her daughter, the respondent. The latter deposited the check or the proceeds of it in the joint and several account at the Spokane State Bank.

In the purchase and sale of securities, Ellen Titus took the advice of her son, Stanley, and her son-in-law, Dr. Whitaker, but depended chiefly on the latter to carry out the transactions. While Dr. Whitaker and Stanley had joint office arrangements (for about six years prior to May, 1926), Mrs. Titus's securities were kept in a safe-deposit box used jointly by them, and thereafter, until her death, the securities were kept in safe-deposit box C-215 above referred to. On January 14, 1924, the date of the execution of the deed and as-

signment to her children, Mrs. Titus had on hand securities of the value of about eight thousand dollars. Some of these, with others for which some were exchanged, together with bonds acquired later, made up the total of fifteen thousand dollars in securities that were deposited April 13, 1926, with the Union Trust Company to constitute the trust fund for the three grandchildren.

The most, if not all of the bonds acquired after January 14, 1924, were purchased by Mrs. Titus with moneys paid by Tate as interest on the unpaid part of the purchase price of the lands covered by his contract; though by no means all of the money paid by Tate was invested in securities.

Ellen Titus died January 21, 1928, while Stanley was at Phoenix. He returned to Spokane in April, but shortly after his return became ill again, and was confined to a hospital for a few weeks. Upon recovering sufficiently he resumed his practice.

On May 16, 1928, the respondent removed the securities from safe-deposit box C-215 long enough to take them to a brokerage firm and have them appraised. The next day, she took from the box the securities, the will executed by Stanley on January 14, 1924, and a promissory note of his dated January 7, 1928, for $4,185, payable to her order, and carried all to Stanley's office. The two of them then made computations of the assets of their mother's estate in cash and securities and divided both equally, treating the securities represented by Stanley's note for $4,185 as assets of the estate. The respondent marked the note "paid" and surrendered it to Stanley. She also delivered to him his will of January 14, 1924, as if it had served its purpose. The cash was divided, after taking into account some minor adjustments on other

items, by the respondent's giving her brother a check on the joint and several account of her mother and herself at the Spokane State Bank. About a month later, the respondent paid her brother, by a check on the same account, one-half of a small bill for drugs, which had been charged to his account at the pharmacy and evidently had been overlooked in the settlement.

In the records which Stanley Titus caused his secretary to keep of securities acquired and disposed of by him, no entries of securities purchased with funds derived from the Whitman county lands or from the Tate contract of sale appear to have been made prior to May 17, 1928, the date of the settlement just mentioned, when the securities he then received and those he had previously got from his mother were entered in his records as having come to him from "Ellen Titus estate."

For the years 1924, 1925, 1926, and 1927, Dr. Titus and Dr. Whitaker each included in his income tax returns one-half of the several amounts paid by Tate in those years as interest on the unpaid part of the purchase price of the Whitman county lands; but for the years 1924, 1925 and 1926, Mrs. Titus more than reimbursed them for the increases in their taxes resulting from the inclusion of those amounts, by paying them sums equal to the normal taxes for those years upon the entire amounts included, without taking into consideration the effect of exemptions in diminishing the amounts she should pay. The returns for 1927 probably were not made until after Mrs. Titus's death.

The respondent and her husband attempted to explain away the effect of this sham by testifying that her mother desired and was accorded the right to take for her own use the "clippings," i. e., the interest coupons, of bonds purchased with proceeds of the Tate

contract, and therefore she insisted upon paying the income taxes. In so testifying, they forgot that income on the bonds held by Ellen Titus was not included in the returns of Stanley Titus and Dr. Whitaker, and that the income upon which she paid (and overpaid) taxes was income by way of interest on the purchase price of the farm. The reason for reporting this income and not the income from securities is obvious: there was a public record showing apparent ownership of the farm in the respondent and her brother, while there was no such record as to the securities.

From what has been said it is perfectly plain that, by reason of an understanding among the parties of which no contemporaneous written evidence has been produced, the conveyances made by Ellen Titus to her children on January 14, 1924, were not to become effective as among the parties until the time of her death, and that that understanding was fully and faithfully carried out. It is equally clear that the respondent and her husband knew all this, notwithstanding their testimony to the contrary.

There was no excuse or justification for Dr. Whitaker or the respondent to testify as they did, unless it be found in certain vague statements by Mrs. Titus that "it is all yours" or the like (referring to some or all of her property). But the excuse is very flimsy. Examples of such statements occur in some testimony of respondent which we shall quote for the purpose of showing that, so far from there having been any intent on the part of Ellen Titus to give all her property to her children before her death, her clearly expressed intent was to keep the major part of it herself.

The respondent had been asked on direct examination to explain why the payments on the Tate contract

were turned over to her mother (after January 14, 1924). She answered that she "would have to go back a number of years in order to do that." When told by her counsel that she might do so, she launched into an account of the poverty and hardships of the family on the homestead, of the struggles, perseverence, and indomitable will of her mother in "getting ahead," of the mother's desire to do all she could for her children and save them from the hardships she had endured, of her ambition for the worldly success of her children, and so on, filling over a page of the record. Then she closed thus:

"She felt that her health had failed, and she was no longer capable of investing this money, and she felt she did not have sufficient education, and she had talked and advised about my brother with me and my husband, so naturally the thing to do—and she still wanted to keep her hand on it and wanted to be sure we would save it—Stanley and I were not thrifty at all—and she wanted to make us so, and she felt that if she kept her hand on it, this money must be invested; if it was given to us we would spend it, and that was the idea, that when the money should be paid into our hands, that they would put it in the bank, and she would know that it was invested. That was the reason.

"Q. Was there any arrangement or understanding that she was to take—that it was to be hers, or anything of that sort?

"Mr. Edelstein: I object; that is calling for a conclusion—what they did and what she did is the question.

"The Court: She can answer if there was any understanding about it.

"Q. Was there any understanding on that subject? A. What do you mean, Mr. Graves? Q. What I am getting at is that when you turned it back to her, at first blush, you turned it back to her because it was hers? A. Oh, no; simply so she could keep her hand on it and see it invested, and she was continually impressing on us, 'it is yours, and I am doing this for

you, and I may seem hard and tight but I am holding this for you; that is what I am insisting on.' ''

Here was a clear and positive admission by the respondent that her mother intended to and did reserve the right to receive and control as her own, so long as she should live, the money to be derived from the sale of the farm.

We have gone rather fully into the facts pertaining to the question of the ownership of the moneys paid by Tate after January 14, 1924, not only for the purpose of showing conclusive reasons why we can not adopt the testimony of the respondent and Dr. Whitaker as being true, but also in order to get in mind facts necessary to a reasonable explanation of what the parties were trying to accomplish. But before coming to the explanation, let us consider some facts bearing upon the probability or improbability of the making of such an agreement as the respondent claims was made between her mother and her brother on January 14, 1924.

In benefactions to her children, Ellen Titus always treated them alike, unless the inequality now contended for by the respondent be an exception. Whenever she made a gift to one, she made a like gift to the other. This applied to gifts both large and small. Upon the birthday of either, she made equal gifts to both. If, in sickness or other time of need, she gave money to one, she gave a like amount to the other. Apparently this was a settled policy of hers. Though she was devoutly religious and a stern disciplinarian, yet her tolerance and her great love for her children restrained her from showing partiality in her benefactions to either of them. There were, it is true, instances of unequal borrowings of bonds or money that might adroitly be given the color of gifts, but we are well satisfied from the evidence that, in every such instance, it

was understood that the security or money should either be returned or repaid during the mother's lifetime or charged to the receipient upon a division of her estate after her death.

An example of such borrowing may be mentioned. On January 7, 1928, Stanley, having been very ill, was about to leave for Phoenix, Arizona, for his health, and needed money. Two thousand dollars worth of bonds were sold and the proceeds turned over to him. Theretofore he had borrowed to use as collateral some Peru bonds of the value of $2,185.00. Dr. Whitaker, who was present when Stanley called to bid his mother farewell before leaving for Phoenix, suggested that some memorandum of these transactions be made by Stanley, lest he forget or should not recover from his illness; so Dr. Whitaker hastily wrote on a slip of paper a short promissory note for $4,185.00 with 6% interest, payable on demand to the respondent, which Stanley signed and the defendant Frances Geselchen witnessed. This note was taken into account when, after the mother's death, the respondent and Stanley had their settlement on May 17, 1928, as heretofore noticed.

The nature of the property conveyed by Ellen Titus to her children on January 14, 1924, was not such as to make it a likely subject of an oral promise to devise or bequeath. Primarily, the property was land, but it was subject to a contract of sale. If the contract should be forfeited, then the subject of the promise to devise and bequeath would be the land, together with any money that might have been paid on the purchase price before the forfeiture. If the vendee should perform, which seemed probable, then the subject of the promise would be money paid on the purchase price after the death of Ellen Titus, in installments extending over a

period of years. What would there be to keep the promisor from spending the money as fast as he received it, or at any time before he died? Nothing. And yet all of the parties to the transactions of January 14, 1924, certainly expected that the contract of sale would be fully performed by the vendee, and there is nothing in the evidence to indicate that, at that time, there was anything more than a mere apprehension that Stanley would not live many years.

Stanley Titus on January 30, 1928, at Phoenix, Arizona, executed the will that superseded the one executed on January 14, 1924. Soon after he returned to Spokane in April of that year, the respondent learned that the later will had been executed, and that, by its terms, she would not receive the property in controversy; yet on May 17, following, at the time of the division with her brother of the cash and securities left by her mother, she surrendered to her brother his will of January 14, 1924—*the only writing she had that lent support to the claim she asserts in this suit.* And following is Dr. Whitaker's testimony as to what happened when his wife told him she had settled with her brother and given him the will:

"Q. When your wife came back on the 17th of May, after the settlement had been made between her and her brother, did she tell you what she had turned over to Stanley? A. No; I didn't ask her. Q. Did she tell you that she had then given back Stanley his will when they made the settlement? A. I think she did, yes. Q. And that is all that was said about it? A. She just said she had made the settlement and gave Stanley his will."

The inference that irresistibly follows from the conduct just described, is that, by May 17, 1928, both Dr. Whitaker and the respondent recognized that Stanley's will of January 14, 1924, had completely served its purpose.

The improbability that Stanley Titus and his mother made the alleged oral agreement might be strengthened by further, though less weighty, considerations suggested by the evidence; but enough has been said to that point. Also, there were a number of inconsistencies, contradictions and evasions in the testimony of the respondent and her husband that are difficult to understand; but, since they related only to minor issues, we attach to them no other significance than that the witnesses are not blessed with exceptionally good memories and that they have the frailties common to most human beings placed in like circumstances.

We have no doubt that the appellant's theory of what the respondent, her husband, her mother and her brother sought to accomplish, and did ultimately accomplish, by their transactions on and about January 14, 1924, is correct. Ellen Titus had made her will in May, 1923, when she was in her own home. The will provided for a trust fund for the benefit of her grandchildren, the daughters of her deceased son, and left the rest of her estate to the respondent and her brother in equal shares. After Ellen Titus had gone to live at her daughter's home, she was prevailed upon (by Dr. Whitaker, we believe, for he was the only one in the family with the requisite aptitude) to put her affairs in such shape that, upon her death, her estate would be distributed according to her wishes expressed in the will, without the delay, trouble and expense incident to probate proceedings, and without the payment of inheritance taxes. Accordingly, the deed and assignment from Mrs. Titus to her children were executed and delivered, but with the understanding that, during her lifetime, the instruments should not be effective as amongst themselves, but that the avails of the contract of sale and the lands should be hers.

On April 13, 1926, which was as soon as she had accumulated enough more securities, she established the trust for her granddaughters. At the same time, she changed her bank account to a joint and several account of herself and the respondent, so that the latter might withdraw money from the account after her demise, and divide it between herself and her brother. On May 13, 1926, Mrs. Titus rented a safe-deposit box in which to keep securities. Theretofore, they had been kept in a vault or box used jointly by her son and her son-in-law, who dissolved their joint office arrangements in May, 1926. The box was rented in the name of the respondent, so that it might be entered without question after her death without any proceeding in court.

This completed the arrangements for the distribution of the estate of Ellen Titus in accordance with the terms of her will, without proceedings in court. And, as we have seen, these arrangements were carried out faithfully and with precision. The will, however, has been preserved, as it ought to have been, in order to protect the respondent and Stanley in the division of cash and securities left by their mother, as against the children of Joseph Titus.

The will of Stanley Titus of January 14, 1924, was executed for the purpose of protecting the scheme from interference by Eleanor Titus, his then wife, in case he should die before his mother; and very probably it was his desire anyway that his sister, instead of his estranged wife, should receive the residue of his estate if he should die while that marriage existed. Mrs. Titus would naturally have confidence that her daughter and son-in-law would cooperate with her to carry out the plan in case of Stanley's death. There would be no reason why they should not, but several reasons why they would.

Some support of Dr. Whitaker's testimony about the making of an oral agreement by Ellen Titus and her son, is thought by the respondent to be found in certain declarations of Ellen Titus to which several witnesses testified. The most of these declarations, according to the witnesses, were made before the execution of her will, and were to the effect that she felt that one's property ought to be "kept in the family," and that her daughter, having children to educate, needed more help from her than Stanley, who could take care of himself.

Assuming that this testimony was admissible, we cannot see that it has any significance. In the first place, the declarations were general and indefinite, and were not too accurately remembered by the witnesses; and in the second place, after the declarations were made, when Mrs. Titus came actually to make her will, upon consultations with all members of the family except grandchildren, she did confine her gifts to her own issue—kept her property in the family—but she deliberately abandoned, if indeed she ever really entertained, the idea of giving more to her daughter than to Stanley.

Two witnesses, one a granddaughter, Joseph's eldest child, testified to declarations made after January 14, 1924. To the granddaughter she is alleged to have said, alluding to her anticipation of an early demise,

"The sooner it comes, the better. I am ready to go; my work is finished. Stanley has made a will in which he left his share of my money to Marguerite, and I can feel any time now that I can go, because my money that I have given my life to make, and scratched and scraped, nobody knows how, will never leave my family."

(Seemingly the witness had great confidence in the integrity of her memory, after the lapse of six years.)

To the other witness, Tate, she is alleged to have said in 1925, that

". . . she had deeded the property and . . . that Stanley should have the *income* of his share of it, and at the end of that time it should revert to the Whitaker family."

(Tate thereafter paid *principal* as well as *income* to Stanley, which was turned over by the latter to his mother during her lifetime.)

Again assuming that the testimony was admissible, and that it was true and reasonably accurate, the declarations go no further than to describe the situation as it existed at the times when the declarations were made; they do not imply an irrevocable contract by Stanley, unchangeable to suit changed conditions and family relations.

The respondent's general theory of her case is this: That Ellen Titus greatly deplored her son's affairs with women and particularly his meretricious relations with the appellant; that, on January 14, 1924, she had him visit her and pronounced the ultimatum to which Dr. Whitaker testified; and that Stanley complied with her demand by agreeing to do as she desired and by making his will on that day.

There are several obstacles to this theory. Stanley's affairs with women, according to the respondent's own testimony, had been much more notorious and reprehensible in the years before his mother made her will than they were then or afterwards. His relations with the appellant had been continuous since about 1914, when he was about thirty years of age, and they had not been interrupted even by his marriage in 1922 to Eleanor, a wealthy woman with a child by a former husband. All this was well known to Stanley's mother when she made her will in 1923, leaving her residuary estate in equal shares to him and the respondent.

It is true that, between the time the will was made and the date of the conveyance on January, 1924, Stanley and Eleanor had become estranged and had separated; but the conditions that produced the estrangement, and were bound to produce it, existed at the time the will was made and were known to exist by the mother. Between the making of the will and the execution of the conveyances there had been no change in Stanley's life and conduct. He had done nothing unusual to disgrace himself or outrage the family. Hence there was no occasion for his mother suddenly to send for him, without previous discussion of the matter either with him or any of the family, and, upon his appearance before her, to make abruptly and without preliminary conversation the statement and demand attributed to her by Dr. Whitaker.

As we noted at the outset, this action was brought to impress upon these lands and the proceeds of the executory contract a trust in favor of the respondent. The rule in this as well as foreign jurisdictions is that, to establish an oral trust, the evidence must be so cogent, clear and convincing as to leave no reasonable doubt that an oral contract or promise was in fact made.

In the case of *Wall v. Estate of McEnnery,* 105 Wash. 445, 178 Pac. 631, we recognized the rule as announced by the New York court of appeals, in the case of *Hamlin v. Stevens,* 177 N. Y. 39, 69 N. E. 118.

"Contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the

natural resort of unscrupulous persons who wish to despoil the estates of decedents. . . .

"While such contracts are sometimes enforced by the courts, it is only when they have been established by evidence so strong and clear as to leave no doubt, and when the result of enforcing them would not be inequitable or unjust. . . .

"Such contracts are dangerous. They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a lifetime may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence."

To the same effect see *Alexander v. Lewis,* 104 Wash. 32, 175 Pac. 572.

In the case of *Henry v. Henry,* 138 Wash. 284, 244 Pac. 686, we not only adhered to, but extended the rule. We there said:

"The evasion of the statutory requirements that some evidence of such an agreement should be in writing, is not to be easily tolerated. Even a slight experience justifies the conclusion that the overwhelming majority of such claims are founded upon no greater basis than a desire to acquire property which was never intended to be so disposed. The evidence, to sustain such oral promises, we have said, must be conclusive, definite, certain and beyond all legitimate controversy. *Frederick v. Michaelson,* ante p. 55, 244 Pac. 119; *Eidinger v. Mamlock,* ante p. 267, 244 Pac. 684; *Fields v. Fields,* 137 Wash. 592, 243 Pac. 369. We are prepared to make, and are justified in making, a statement even more stringent than that, and to hold that one seeking to establish an oral contract, whereby property of the deceased is sought to be taken, must establish all the elements of the contract and a right to have it enforced beyond all reasonable doubt. Without such a rule, no estate of any considerable size is safe from claims that it has been devised and bequeathed by word of mouth."

While it is true that the facts and circumstances in the *Henry* case, *supra,* are different from the facts and circumstances here, yet the rule as there announced was not limited to the peculiar facts of that case, but was a statement of a rule to be generally applied to cases of this character. The rule as there announced is especially applicable to the facts and circumstances here.

Upon all of the evidence, we find that Stanley H. Titus did not, on January 14, 1924, or at any other time, agree to make to the respondent a devise and bequest of his half of the property that day conveyed to them by their mother.

The judgment of the superior court is reversed, and the cause is remanded with directions to enter judgment for the defendants.

TOLMAN, C. J., MILLARD, and BEALS, JJ., concur.