Middleton, J.
The controlling question is whether the contract of February 3, 1925, created a trust. Did the defendants thereby become trustees of a continuing and subsisting trust?
It is appropriate to first consider the inherent characteristics of a trust.
In Restatement of the Law of Trusts, chapter I, page 6, the following is stated as the definition of trusts:
“A trust, as the term is used in the Restatement of this subject * # * is a fiduciary relationship with respect to property, subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.”
That definition is cited and approved in 1 Scott on Trusts, 34, Section 2.3.
The definition in 1 Bogert on Trusts and Trustees, 1, Section 1, is:
“A trust may be defined as a fiduciary relationship in which one person holds a property interest, subject to an equitable obligation to keep or use that interest for the benefit of another.”
The foregoing definitions are generally accepted.
*27 With respect to the relationship which must exist between the trustee and the beneficiary, the following are of interest:
“Possession of the trust res by the cestui is not a natural incident of a trust. The trustee is almost always given possession and powers of management. Consequently a transaction allowing another possession of land is more apt to indicate an intent to transfer a legal interest to the possessor than to make such possessor a cestui que trust.” 1 Bogert on Trusts and Trustees, 367, Section 50.
“Generally the trustee may not be the sole trustee and the sole beneficiary of a trust * * *.” 54 American Jurisprudence, 117, Section 137.
“A fundamental essential of any trust is separation of the legal estate from the equitable estate and the beneficial enjoyment; there can be no trust when both the legal title and the beneficial interest are in the same person. * * * Where the holder of the legal title and the cestui que trust are one and the same person, the result is a merger of the legal and the equitable title, defeating the trust and ordinarily conferring a fee simple title upon the person holding the legal title and beneficial interest.” 54 American Jurisprudence, 46, 47, Section 35.
In the instant case we do not have the usual situation of three parties, to wit, a settlor, a beneficiary and a trustee. It seems uncontrovertible that the transfer by absolute deed and any intent to be drawn from the contract, if any actual intent can be deduced therefrom, was to protect the grantees of the deed who are defendants herein.
It has long been settled law that a trust may be en-grafted upon a deed absolute but it is equally well settled that the evidence must be of a very persuasive character. This court has so held in Russell v. Rruer, 64 Ohio St., 1, 59 N. E., 740. The second paragraph of the syllabus of that case reads:
*28 “A trust engrafted on an absolute deed may be shown by parol evidence; but the declaration of such trust must be contemporaneous with the deed, and the evidence beyond a reasonable doubt as to the existence of the trust, and must be clear, certain, and conclusive as to its terms and conditions. ’ ’
The above decision of this court is in harmony with the general rule as stated in 1 Bogert, 354, 355, Section 49:
“Since a suit to establish a trust is a civil action, it might at first thought be supposed that a court or jury trying the issue of fact as to the existence of the trust intent should be content with proof by a preponderance of the evidence. But, since the action is equitable, one meets the natural conservatism of chancery against efforts to disturb relations recognized by courts of law. The facts of a situation presented to the chancellor will give rise to certain rights and duties enforceable in courts of law, if chancery does not intervene. Chancery is loathe to interfere with the operation of the rules and principles of law, unless the proof of facts which bring into play principles and rules of equity is strong. Such interference generally involves giving a different effect to contracts or conveyances from that apparent on their faces, the disturbance of legal titles, and the creation or recognition of equitable interests. It is therefore not surprising that courts of equity have held that the chancellor should require, before finding the existence of a trust intent and its appropriate expression, that ‘clear and convincing’ evidence be presented to him.”
The above statement from Bogert is supported by citations from many states. Without referring to all of them, we call attention to the following:
Griffin v. Griffin, 200 Ark., 794, 141 S. W. (2d), 16; Olson v. Olson, 4 Cal. (2d), 434, 49 P. (2d), 827; Johnson v. Wikstrom, 242 Ky., 636, 47 S. W. (2d), 61; *29 Price v. Price, 162 Md., 656, 161 A., 2; Reeves v. Weber, 111 N. J. Eq., 454, 162 A., 566; Whitaker v. Titus, Exrx., 166 Wash., 225, 6 P. (2d), 649; Illinois Steel Co. v. Konkel, 146 Wis., 556, 131 N. W., 842; Parrott v. Hofmann, 151 Neb., 249, 37 N. W. (2d), 199; In re Bruner’s Estate, 179 Okla., 339, 65 P. (2d), 1209; Ewart v. Jones, 255 F., 688. See, also, the annotation in 23 A. L. R., 1500 et seq.
With respect to the character of evidence required to engraft a trust upon a deed, the courts used various expressions in the above-cited decisions and in other cases included in the annotations. Those expressions include that the evidence must be “clear, unequivocal and convincing,” “clear, convincing and satisfactory,” “clear and unmistakable,” “certain, reliable and convincing,” “clear and convincing,” and that it “must establish the facts beyond reasonable controversy. ’ ’
Another well accepted rule of law is that the burden of proving the existence of a trust rests on the person asserting it.
The conduct of the parties subsequent to the execution of the instrument relied upon as creating a trust constitutes important evidence of their intent when the instrument was executed. In this connection it is said at pages 361, and 362 of the above-cited volume of Bogert:
“That practical construction of an instrument is strong evidence of its intended meaning is a rule applying to trusts as well as other relationships. If settlor, trustee and cestui have acted as if there were a trust, after its alleged creation, and carried out the parts they would naturally be expected to perform under a trust, such evidence will have important effect in leading a court to declare that a trust was intended and established.
C C * # #
*30 “On the other hand any conduct by the settlor or trustee inconsistent with a trust and affecting the possession, use, profits, or power of alienation of the alleged trust res may well have probative effect against a trust. ’ ’
When we study the written instrument or “contract” here involved and consider the conduct of the parties thereunder, it is difficult to conclude that the plaintiff carried the burden of proof or to agree with the decisions of the lower courts that a continuing subsisting trust was created.
This written “contract” is an anomalous instrument. If the intent of the parties and the full purport of the instrument must be determined “from its four corners,” it might well be found so vague as to be void and unenforceable.
The instrument reveals one thing with certainty— that whatever was intended to be accomplished thereby was to be for the benefit of the grantees in the deed, who are the defendants herein. If a trust was intended the defendants were to be the sole beneficiaries. When, however, the instrument is studied with the idea of determining whether or not it converted the absolute deed into a trust, it is apparent that the instrument is lacking in many respects. Among the points of uncertainty which are fatal are the following:
(1) Who was required to pay off the debts or by whom was it contemplated the debts should be paid?
(2) When were the debts to be discharged?
(3) When must the contemplated sale by defendants take place?
(4) Any obligation of defendants to currently account to plaintiff.
The “contract” contains no provision for reconveyance of the property to the grantor (plaintiff) except on a condition which manifestly was not fulfilled. That condition was that ‘ ‘ if the party of the first part *31 [plaintiff] pay or cause to be paid the indebtedness.” The record shows conclusively that the plaintiff never paid, or caused to be paid, even one dollar of the indebtedness. The paragraph preceding the one from which the above quotation is taken is endowed with meaning only under two circumstances: First, if the mortgage claim and the obligations on which the defendants were sureties were paid by the grantor then the remaining balance or net profit should be paid to the grantor. Obviously that did not occur. Second, by reading into that paragraph something that it clearly does not contain, to wit, an obligation on the part of the grantees of the deed (defendants) without assistance of the grantor to pay off all the indebtedness. It is interesting to note that throughout the argument of plaintiff’s counsel and the testimony of the plaintiff the theory was advanced that this agreement somehow placed upon the defendants an obligation to pay off all this indebtedness — which was not theirs — to clear the plaintiff of debt and then to transfer the property back to the plaintiff. In our judgment the instrument by its own terms falls far short of constituting clear and convincing evidence of any such intent. If reliance is to be placed solely upon the instrument we must hold that no trust was thereby created.
If we look to the conduct of the parties under the instrument we find the following facts undisputed in the record:
On February 3, 1925, the property was in distress. The debts of plaintiff amounted to approximately $13,000. The property, which she had purchased in 1919 for $6,500 or $7,000, was still subject to the mortgage in the amount of $4,700 and delinquent taxes amounting to $283.11. The defendants were sureties on notes to the bank for $7,879.90, which debt could not be satisfied out of the property unless and until the mortgage and delinquent taxes were paid. There *32 was no prospect of plaintiff paying any part of these debts. The bank and the loan company demanded action.
On February 3,1925, the defendants assumed control of the property. Approximately ten weeks later, without objection, they leased the entire property to an oil company for a period of ten years at a rental of something less than $100 per month. Under that lease current taxes and improvements were the obligation of the oil company. At the end of ten years the property was leased to a different oil company.
The plaintiff continued to reside in the house for about a year after February 3, 1925. She made two payments of rent to the defendants but after the first oil company’s lease was executed she paid monthly rent of $25 to the oil company.
Plaintiff made no payments upon the indebtedness to the bank or to the loan company after February 3, 1925. The note to the bank for $7,879.90, which existed on February 3, 1925, was due in 90 days. The renewal of that note was executed only by the defendants as were all subsequent renewals thereof. In other words, there was a novation at the bank and the defendants were substituted as the sole makers of the renewal notes.
Plaintiff took no part in the management of the property and made no inquiry concerning it except that in 1937, claiming to have lost her copy of the ‘ ‘ contract” of February 3, 1925, she brought an action against these defendants in discovery to obtain a copy. The defendants did not file an answer, for reasons not disclosed. After a delay of five years, which is wholly unexplained, the defendants furnished plaintiff with a copy and at her request gave her a statement of the amount remaining due both the bank and the loan company.
*33 The defendants are farmers. With their son and daughter they lived upon and operated a farm of 145 acres. Immediately after the defendants assumed control of the property they borrowed $500 with which to pay the delinquent taxes amounting to $283.11 and to make necessary street repairs. At that time the plaintiff was living in the property as a tenant and paying rent.
The income from the property was not sufficient to satisfy the bank and the loan company, especially during the depression years. Consequently, the defendants used the income from their farm to meet required payments. Still more money being required, they borrowed from their son, $1150 in 1930, $500 in 1932, and $600 in 1933. They also borrowed from their daughter, $1125 between 1932 and 1937, and in addition thereto, Mr. Irons in 1932 borrowed $2,000 on a life insurance policy. All the money so borrowed was paid on the debts in question.
The entire indebtedness was probably paid in full some time in 1938 but payment had been accelerated to an undetermined extent by defendants using other income and borrowed money.
All during this time the plaintiff sat by and did nothing, although the debts were hers and not those of the defendants. It is significant that at the end of 90 days following the execution of the “contract” when the note at the bank had to be renewed, the obligation of the plaintiff terminated by her failure to sign that or any subsequent renewal notes and by the bank’s accepting the sole obligation of the defendants. Even if that were not true, the statute of limitations ran against her obligation on the original note long before this action was instituted. It is also not without significance that apparently plaintiff did not desire return of the property when, in response to her demand in 1937 for a copy of the “contract,” she was advised *34 that the mortgage indebtedness had not been fully paid. She waited until the defendants by their own efforts had completely paid off the mortgage. She was then free of all obligations and could safely say to them, “Now I want my property back.”
The conduct of the parties lends no support to the plaintiff’s claim of the creation of a trust. On the other hand, their conduct fully supports the position of the defendants stated upon the witness stand that they at all times considered the property as theirs; that the existence of a trust was never mentioned until this action was commenced and that they are under no obligation now, more than 25 years after the contract was executed, to recognize it as an instrument creating a trust. It must also be borne in mind that this is an action in equity. The conduct of the plaintiff falls far short of establishing rights which a court of equity can recognize.
The plaintiff made no claim in the amended petition that the “contract” in question created an equitable mortgage, but in the briefs and oral presentation that question was discussed. It is manifest that the written instrument of February 3,1925, contains no defeasance clause such as is necessarily contained in a mortgage. A defeasance clause is a provision which will of itself render the instrument null and void upon the payment of the obligation by the debtor. This statement is supported by 9 Thompson on Real Property (Perm. Ed.), 256, Section 4880, where the author also says:
“The distinction between a defeasance and a contract to reconvey is that the performance of the defeasance condition annuls the deed, while in the other case there is no annullment. * * * A contract to reconvey upon a stated condition is not such a defeasance as will convert a deed absolute into a mortgage.”
*35 Even if a defeasance clause were to be inferred on some equitable theory, the defeasance clause would not be operative for two reasons, first, the plaintiff did not pay, or cause to be paid, the debts in question and, second, its operation would have been barred by the statute of limitations for the reason that she breached any implied agreement to pay her own debts and save the defendants harmless as sureties. This breach occurred when she failed to renew the 90-day note on its due date which was 90 days after February 3, 1925. The “contract” in question dated February 3, 1925, did not create an equitable mortgage.
It remains to be considered whether the instrument dated February 3, 1925, constituted a simple contract under which the plaintiff is now entitled to some relief. At the outset it is manifest that the instrument is wholly lacking with respect to time element. It is not consistent with general principles of law that the defendants should forever be under obligation to re-convey the property to the plaintiff. Defendants undertook to cure this absence of the material element of time by introducing evidence that when the ‘ ‘ contract ’ ’ was executed the plaintiff had a definite prospect of making a quick sale of the premises and that the “contract” was designed to insure payment to her of any excess above the amount of the debts which might result from such sale and that the “contract” was intended to function for not to exceed 90 days. Had the court admitted the evidence proffered, valid reason would have been established for the execution of the contract. In view of the conclusion reached by this court with respect to the major question at issue, it is unnecessary to pass upon the ruling of the court rejecting the proffered testimony. Without it, however, the contract is either invalid for lack of the time element or the contract would run only for a reasonable time. 9 Ohio Jurisprudence, 474, Section 236; Com *36 missioners of Highland County v. Rhoades, 26 Ohio St., 411; Harris v. Ohio Oil Co., 57 Ohio St., 118, 48 N. E., 502; Stewart v. Herron, Admr., 77 Ohio St., 130, 82 N. E., 956; Rock v. Monarch Bldg. Co., 87 Ohio St., 244, 100 N. E., 887. Twenty-two years and seven months after the execution of the contract is more than a reasonable time within which to undertake to enforce it. Furthermore, it is again to be noted that the plaintiff has not fulfilled the terms of the contract requiring her to pay, or cause to be paid, all the debts in question. Now she will never be able to fulfill that condition for the debts have been paid through the efforts of the defendants and with the full knowledge and acquiescence of the plaintiff.
It is unnecessary to discuss the accounting and the many objections taken thereto by the defendants. It is the conclusion of this court that the judgment of the Court of Appeals should be reversed and that final judgment be rendered in favor of the defendants.

Judgment reversed.

Taft, Matthias and Zimmerman, JJ., concur. Weygandt, C. J., and Hart, J., dissent.